THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GWENDOLYN EVANS, Defendant-Appellant.

First District (3rd Division)   No. 1—91—0115

Opinion filed March 9, 1994.

Rita A. Fry, Public Defender, of Chicago (Lynn Flanagan Wilson and Evelyn G. Baniewicz, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Michael J. Pugh, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Gwendolyn Evans (Gwen), killed her husband Jerry Evans (Jerry) and was found guilty of first degree murder by a jury. She was sentenced to 20 years' imprisonment. On appeal, she contends that (1) the State failed to prove beyond a reasonable doubt

that she was not acting in self-defense, (2) the trial court erred in failing to instruct the jury that her conduct could be considered self-defense even though Jerry was not armed, and (3) that her constitutional right to due process was violated because of the wording of the Illinois Pattern Jury Instruction on second degree murder that was given to the jury. We reverse the judgment of conviction for the reason that the State failed to prove beyond a reasonable doubt that Gwen was not acting in self-defense.

Gwen was 39 at the time of the homicide. She graduated from grade school and attended Du Sable High School for three years. At the time of her arrest she was unemployed and receiving public aid for food and any medical attention that she needed. Although Jerry worked, he spent his money on himself and did not give Gwen the money needed to support the household on a regular basis. Jerry was 6 feet, 230 pounds, and physically well developed. Gwen is 5 feet 8 inches and 135 pounds.

At close to midnight on December 10, 1988, Gwen stabbed Jerry with a kitchen knife that she had been using earlier in the day to peel potatoes. There was a stab wound to Jerry's lower chest about four inches long. There was another stab wound in his upper left chest area about an inch long, and there was a stab wound to his left upper arm. The stab wounds were consistent with the premise that they were inflicted by a person who was right-handed and shorter than the decedent; Gwen is right-handed. Jerry died from the wounds on December 11, 1988.

Gwen and Jerry were married in July of 1980. The two of them and Gwen's daughter lived in Chicago. About a year after the marriage, Jerry began drinking heavily, going out alone, and staying out late. He was getting drunk every weekend. Also, he would come home drunk and start arguments and fights with Gwen.

As a result of the many fights while Jerry was drunk, Gwen suffered numerous physical injuries. On separate occasions, Jerry hit her with a variety of objects, including a baseball bat, a skillet, and a shovel. On other occasions, he beat her with his fists and slapped her, and he spit on her and threw objects at her. Gwen was also verbally brutalized continuously by Jerry. Jerry would tell her: "Fuck you bitch." He would also call her names such as "mother-fucking ass" and "bitch," and "red-assed bitch."

In one incident, Jerry slapped Gwen's face while he was drunk, and she threatened to call the police. As Gwen was running upstairs to her girl friend's apartment to use the telephone, Jerry grabbed a snow shovel from the hallway closet and said: "You old red bitch." He then hit Gwen in the leg with the shovel. A couple of days later,

due to the intensive pain, Gwen went to Michael Reese Hospital. Gwen's leg was so swollen that she could not walk. The parties stipulated to the testimony of Jenny Stevens, a nurse at Michael Reese Hospital. Her testimony corroborates the testimony about Gwen's visit to the hospital for the injury.

In another incident, Jerry hit Gwen on the left shoulder with a piece from a broken baseball bat. Gwen was taken to Michael Reese Hospital, where an orthopedic surgeon found that she had a hairline fracture to the tip of her right shoulder, and Gwen's arm was put in a sling for three or four weeks.

On another day, Jerry slapped Gwen and continuously hit her until she fell on the couch. He then slapped and hit her again. He beat her continuously until her tooth came out and she swallowed it.

On another occasion, Jerry became angry and told Gwen: "Fuck you, bitch." He then threw a glass peanut butter jar at her. Gwen ducked her head and threw her hand up. The jar hit a cabinet and broke, but a piece of glass cut Gwen's finger. The finger was bleeding and when the bleeding would not stop, Gwen went to Michael Reese Hospital, where she was treated for a serious cut on one of the fingers of her left hand.

On the day after one of Gwen's birthdays, Jerry called Gwen a "red-assed bitch." He beat her and slapped her so hard that it sounded like a gunshot. He then ran out of the house and did not come back until the next morning. When he returned he was drunk. Gwen was lying in bed, wearing a nightgown. Jerry came in, threw Gwen out of the house and locked the door.

Gwen went across the hall to a neighbor's apartment and telephoned the police. She then went back to her apartment and began knocking on the door. The police never came. But, after awhile Jerry let her back in the apartment. Gwen was having sharp pains in her neck and shoulders, as well as shortness of breath, due to Jerry's beating the night before. As a result, Gwen asked Jerry to take her to a hospital. He took her to Michael Reese Hospital, where it was found that Gwen had a swollen area on her forehead and tenderness in her neck and shoulders.

There were other specific incidents of physical and mental abuse while Jerry was drunk. One day he came home drunk and began throwing pots, pans, and catsup, mustard and mayonnaise jars at Gwen. He then picked up a cocktail table and threw it in the middle of the floor and it broke in half. Also, he threw a skillet which skimmed Gwen's head. Every time Gwen tried to get out the door, she would get hit by Jerry.

Eventually, Gwen was able to escape and she ran down the street

to see a friend. Gwen returned to her apartment with the friend, who asked Jerry to "cool out." Jerry replied: "Okay, man. I ain't got nothing else to throw at the old red bitch so I guess I'll just go on and cool out." He then fell asleep at the kitchen table.

One winter, Gwen and Jerry were outside making a snowman. Jerry wanted to drag Gwen through the snow, but Gwen refused. Jerry grabbed Gwen and dragged her through the snow against her will. As he dragged her, Gwen's jacket was pushed upward, and rocks and glass scratched her back. Gwen kicked and screamed until he finally let her go. Gwen then ran to her sister's apartment. Jerry followed, and banged on the door and tried to get into the apartment. Jerry yelled through the door that he was going to drag Gwen through the snow again, and he called her a "red-assed bitch," and said that he was going to beat her "mother-fucking ass." He also told her that he was going to "fuck" her up. Finally, Jerry left, and Gwen spent the night with her sister.

Around August of 1988, Gwen learned that Jerry had a girl friend. Gwen found out about the girl friend because the girl friend would telephone the apartment asking for Jerry, mostly on weekends. Gwen asked Jerry to tell her to stop calling. Jerry told Gwen that he had gotten drunk and given the telephone number to the other woman but he did not mean to give her the telephone number. Jerry said that he would tell her to stop calling.

On the morning of December 10, 1988, Jerry was home. After answering a telephone call, Jerry told Gwen that he was going to the store, and he left the apartment. As he left, Gwen asked Jerry if he would bring back some chicken wings for her to eat for lunch. Gwen waited for Jerry to return, but at noon she started to peel some potatoes with a kitchen knife because she was hungry. There was no other food in the house. The kitchen knife that Gwen used to peel the potatoes was the knife that was later used in the homicide.

Later in the day, Jerry returned with the chicken wings and a bag of food from a Cub Foods mart. Jerry put the Cub Foods bag on the couch, and the telephone rang. After answering the telephone call, Jerry said that he had some place to go and left the apartment. Gwen then noticed the Cub Foods bag and said to herself: "He must have took his friend out to Cubs and I've been asking J.D.—I wanted to go shopping too, you know." Gwen looked in the bag to see what was inside, but left the bag on the couch.

Gwen then began sweeping the living room floor, and her friend Shirley stopped by to visit; Shirley lived in the same apartment building as Gwen. Later, at about 4 p.m., Gwen went to Earl Scott's house. Earl Scott was a friend of both Jerry and Gwen. Gwen had

heard Jerry mention Earl Scott's name on the telephone earlier, and she thought that Jerry might be there.

Earl Scott was not home when Gwen arrived, but his uncle was there and Gwen stayed and talked with him. Earl Scott testified that he was not home at the time because Jerry had come to his house that afternoon and the two of them went out drinking. Earl Scott testified that Jerry was drinking beer and Bacardi rum, and that they had "quite a lot to drink that day."

When Earl Scott came home, he told Gwen that Jerry just dropped him off and was on his way home. Gwen, therefore, telephoned her home to tell Jerry that she was on her way home. When Jerry answered the telephone, he told Gwen: "You can keep your red ass over there. You ain't been here all day. What you want to come here now for."

Gwen knew from the conversation that Jerry was drunk, and after she hung up the phone, she asked Earl Scott to walk her home. Earl Scott walked Gwen to the front steps of her apartment, but he did not walk her upstairs. When Gwen got home, it was close to midnight.

After she entered the apartment, she saw Jerry. He was standing in the living room and he "looked like a wild man." His eyes were "bugged" and he had sweat on his face, with his hair standing straight up. He looked mad. He said: "Bitch, you finally brought your ass home, huh?" Gwen said: "I see you took your girl friend to Cub's, huh?" Jerry said: "I'm a grown assed man. I can take anybody anywhere I want them. That is my goddam car. I pay the car note. I work hard for that mother-fucking car. I do what I want to do. Yeah, I took her to Cub's Food."

Gwen thought Jerry was going to hit her, so she started running to the bedroom. She was trying to go around a table to get to the bedroom, but Jerry cut her off. Gwen testified as follows:

"I went across. I did not go to him. I went across to the other side of the couch because I know he was going to start hitting me, to try to go running to the bedroom, and before I can get over there, he ran over there and he started hitting me in my face with the paper bag. I took the bag and snatched it and threw it on the floor. That's when he come down to my face and he started saying, if you all don't like what the fuck I do, you can get your mother-fucking ass out of here.

When he was in my face, he started spitting in my face. I said, J.D., get out of my face. Stop spitting on my face. He say, you don't tell me what to do. He started to spit—a whole lot of spit started coming on my face.

So I took his forehead, that is when he hit me in the back of my head and kept on hitting, kept on hitting. I had my head down.

I was closing my eyes, I looked down on the floor, and I seen that knife down there. So I picked the knife up and I just started stabbing and I was just stabbing at him and stabbing and just kept on swinging my arms, kept swinging my arms back there, and he kept on hitting me.

Then he said, you old red bitch, you done stabbed me. I'm going to break your mother-fucking neck. So I dropped the knife. That is when I ran down the back steps.

He was chasing me down the back steps. He was chasing me. He was chasing behind me and then he started hollering, Gwen. I ran downstairs and I ran behind the garbage can that was down there on the first floor.

He kept saying, Gwen, Gwen. I wouldn't answer. I had did that one time, and when I came out, he really beat me up. I said, I ain't going to answer. I did not know if I had stabbed the knife for real or not anyway.

Then I heard something say boom. So then I started tippy toes out because I didn't know if he was going to jump out of somewhere or what. I ain't seen him over there where the steps was at, and then I looked over that way and that is the garage over there, the roof, and he was laying over there.

I said, J.D., J.D. He said, Gwen, Gwen. So I climbed over. You got to kind of like climb over there. I climbed over there, and that is when I put his head in my lap.

I said, J., J. He said, Gwen, Gwen. I said, J., you're hurt. I'm going to call the police. I'm going to get you some help. I'll be right back.

When I ran into the house, I ran—. It was raining outside, rain and snow. Then the bedroom is right there. He was getting wet and everything. I snatched a blanket off the bed and I ran back out there and covered him up. Then I ran back in there, and I called the police.

I called Earl first. *** Then I called the police and I went back out there with J.D. and put J.D.'s head back on my lap and I sat out there with him and I seen out front the flashing lights so I assumed that was the police and I was saying, back here, help, help, help. They heard me. I said come in the back, come in the back. They came around the back and—.

\* \* \*

*** Then Earl had came up and I climbed back over and Earl said, what happened. I said, we got to fighting. He said, don't tell the police nothing, you know. He said, he'll be all right, you know. We thought he was going to be all right.

The ambulance came, and they dragged him down the steps. They couldn't pick him up. The man was too small. He bumped his head going down the steps.

I told him to wait a minute, let me hold his head. I caught his head down the last couple of steps and they put him in the ambulance and me and Earl were standing there and I asked, could I sit in. They told me, no, there is no room, you know.

\* \* \*

I told them that I was his wife and this was his best friend and could we sit in there with him and they said, no.

By that time Ricky had pulled up—my brother, Ricky, was coming over to spend some time with us. He asked, what happened. After I explained to him, he said, well, you can ride with me to the police—to the hospital so—.

Q. Did you go to the hospital with him?

A. We rode behind the ambulance to the hospital and—.

Q. Was J.D. dead?

A. When I got to the hospital, that is when the police the lady officer came over and said, you're under arrest, and she read me my rights and took me down to the 51st Street Police Station.

Q. Gwen, when you called 911, you told them some dudes stabbed your husband?

A. Yes. I figured if I said that they would hurry up and come fast because they know it was a bad neighborhood and they know a lot of times you can get stuck-up and a lot of peoples got messed up around there and they know there is an whole lot of thugs over there.

If I tell them it was some dudes, you know, that robbed him and stabbed him, they will hurry up and come. Because if you just say, I cut my husband, they may just take their time, you know. They think it's just—.

Q. A domestic?

A. Yeah and wasn't nothing, you know. They take a long time to come. In order to get an ambulance to come, you have to tell them—you have to stretch it real hard.

Q. When you saw the police later, you told them you stabbed him?

A. Yes."

In addition, Gwen testified as follows:

"Q. How come you picked up that knife?

A. Because when J.D. told me he was going to break my neck, I thought he was going to break my neck. When he hit me last time and I thought my neck was broken, I went to Michael Reese Hospital. They thought it was broke. He told me, he said, next time, I'm going to break your mother-fucking neck if you ever, you know, put your hands on me. So when I pushed him in his

face and he say he was going to fuck me up, I figured he was going to try to break my neck because he kept hitting me all behind my head. He was hitting harder and harder. I didn't want my neck broken. I was trying to keep him from stop hitting me.

Q. Gwen, did you kill him because he had a girl friend?

A. No. We didn't even get into about the girl friend. It was because he was—I had no intention to kill him. I wanted him to stop. I stabbed him because he was hitting me. He kept hitting me harder, and I know he was going to break my—All I can think about is he is going to break your neck, he's going to break your neck. You'd better stop him. If he breaks your neck, you're dead, you know. I was trying to stop him from breaking my neck.

Q. How do you feel about J.D.?

A. I still love J.D. I miss him. I wish he was still alive. I wish I was still his wife, and he was still with me."

Paramedics and the police arrived on the scene shortly after the occurrence. Gwen told one of the police officers at the scene that "my husband left the apartment to get some cigarettes, he got to the alley, and then ran back upstairs holding his chest yelling 'Gwen, Gwen.' " Gwen testified that she told the police officer that because, "I didn't think it was their business to know exactly what happened, at that time." She said, "I just wanted to hurry up and get my husband to the hospital." Later, when she was at the police station, she told the police that she stabbed her husband and gave an account of what occurred.

In the meantime, a police officer at the scene went up the back stairs and into the second-floor rear apartment. There was blood splattered all over the wall above the couch in the front room, which would indicate a violent struggle preceded the homicide. The blood that had been splattered was "leading toward the kitchen." There was also blood on the kitchen floor.

Another investigating police officer who was at the scene testified that he went to the apartment and looked in a dresser that was near the couch. He testified that in the top drawer of the dresser he saw a black fur scarf or muffler, and under the garment was the knife that was involved in the homicide. The knife was a "standard kitchen knife," about nine inches long overall, with a six-inch blade. The knife still had blood on the blade from the homicide. In addition, another investigating police officer testified that he found a pair of bloodstained blue jeans in the apartment. The bloodstained blue jeans were found in open view on the bed in the bedroom near the kitchen.

Gwen was arrested at Michael Reese Hospital and taken to Area 1 police station. The felony review unit of the State's Attorney's of-

fice was called into the case, and an assistant State's Attorney took an oral statement from Gwen at the police station. No tape recording was used. The assistant State's Attorney made a handwritten summary of Gwen's oral statement, which was signed by Gwen. The handwritten summary by the assistant State's Attorney provides:

"I explained to Gwendolyn Evans I am an Assistant State's Attorney, a lawyer working with the police and not her lawyer. I gave Gwendolyn Evans the above rights which she indicated she understood. Gwendolyn then agreed to give the following statement, which is a summary and not verbatim. My name is Gwendolyn Evans. I also use Gwendolyn Knight. I am 39 years old. I live at 1243 east 46th Street. Jerry Evans is my husband. We have been married for 9 years. I call Jerry J. D.

On Saturday, 10 December '88 Jerry and I got up around 11 o'clock in the morning. Jerry went out to get some chicken wings. When he came back he had a Cubs Food bag. Jerry dropped the stuff off and left. I stayed in the house all day. I knew Jerry had been out a long time. Jerry had a girl friend for about three months. Jerry had given her our phone number. Jerry said it was a mistake. She kept calling. Around 12 o'clock I had one or two drinks. Around 4 o'clock Shirley came up and we finished the chicken wings. When it started getting dark, I went to A.D.'s house. A.D. (the initials) is Earl's uncle. I was hoping J.D. would come by. Earl came home and said J.D. just dropped him off. I called home and talked to J.D. Then I went home. When I came in J.D. was in the living room. J.D. and I got into a fight about him taking his girl friend to Cub Foods. J.D. said he was a grown man and could do whatever he wants or can do whatever he wants. We kept arguing. J.D. hit me with his hand. He went around the table. I saw the knife on the table, picked it up and stabbed him. I don't know how many times I stabbed him. I just chopped at him. Then I ran. J.D. ran after me. He fell on the back porch by the steps. J.D. was calling Gwen, Gwen. J.D. was bleeding. I went back and said get up, get up. J.D. didn't get up. I ran in the house and got the blanket. I put his head on my lap. That is how I got the blood on my jeans. J.D.'s eyes started rolling.

I went and called Earl and the police. After I stabbed J.D. I dropped the knife. The knife has a wooden handle. The police and State's Attorney had treated me okay. No threats or promises were made to me to get me to make this statement. I am telling this because it is the truth.

The first story I told the police wasn't true. I didn't say I stabbed J.D. because I was scared. I have had cigarettes and coffee. I was allowed to go to the bathroom. I can read and write English. I am not under the influence of alcohol or drugs."

The paramedics who were at the scene took Jerry to Michael Reese Hospital, where he was later pronounced dead by a physician. Dr. Kalelkar performed an autopsy of the decedent. He noted in his autopsy report that Jerry had a blood-alcohol level of .243, almost $2^1/_2$ times the legal level for a finding of intoxication. (See 625 ILCS 5/11—501 (West 1992).) Dr. Kalelkar also testified that Jerry had an enlarged liver, which would be consistent with chronic alcoholism.

The facts in this case leave no room for doubt that Gwen was a battered woman imbued with all of the psychological and emotional impairments of what we all know and commonly call battered woman's syndrome. Thus, we need not waste time or paper attempting to legally define or expound the symptoms of battered woman's syndrome and its application to this case. Paraphrasing the classic statement of Justice Potter Stewart: "Perhaps we could never succeed in intelligibly defining the kinds of matter we understand to be embraced within the shorthand description of battered woman's syndrome. But we know it when we see it, and what we have in this case is precisely that." See *Jacobellis v. Ohio* (1964), 378 U.S. 184, 197, 12 L. Ed. 2d 793, 803-04, 84 S. Ct. 1676, 1683 (Stewart, J., concurring).

■ When the defendant is a victim of battered woman's syndrome in a case involving the homicide of her husband, and the homicide was committed during the course of another beating, the law can no longer ignore the fact that in reality what occurred involved two victims. Moreover, because of the nature of the event and the present-day socio-legal problems that are involved in domestic violence cases, a crucible for justice exists when a woman is both the victim of battered woman's syndrome and the killer of her husband during the course of another beating.[1]

Thus, the law must finally step up to the times and itself comprehend the reality of domestic violence cases which involve victims of battered woman's syndrome. If the law does not keep up

---

[1]The Illinois Domestic Violence Act of 1986 provides that its underlying purposes are to: "(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide ***; *** (3) Recognize that the legal system has ineffectively dealt with family violence in the past *** and *** that, although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims." 750 ILCS 60/102 (West 1992). The original Illinois Domestic Violence Act (authored by then Rep. Alan J. Greiman) was enacted in 1981.

with the times in this area, a system whose *raison d'tre* is justice will mete out injustice under the guise of unenlightened rationalizations.

As a start in the right direction, the law must make it absolutely clear that when the defendant is a victim of battered woman's syndrome, that fact must be taken into account with all the other facts if the homicide occurs while her husband is imposing another beating. In addition, in reviewing such cases, judges must examine the record with the discerning eye and cool judgment of a talmudic exegete. The present case demonstrates the need for such exacting care.

In its brief, the State states unequivocally that "the [P]eople's theory of the case was that defendant killed Jerry because she was jealous about his girlfriend." The problem with the State's theory is that while there may be evidence that Gwen was "jealous about his girlfriend," there is no evidence that she killed Jerry *because* she was jealous of his girl friend. Merely establishing the existence of jealousy by a party in a homicide scenario is not the same as establishing the reason for the homicide. It is very important to bear this distinction in mind when there is a homicide committed by a battered woman who kills her husband not in any prearrangement but rather in an attempt to stop another beating.

■ Here, it is virtually indisputable that Jerry started the incident while he was drunk and that he was the aggressor. The evidence is that he hit Gwen before he was stabbed, and that before he was stabbed he was in the midst of imposing a physical beating of Gwen as he had done repeatedly in the past. It follows that while jealousy may have precipitated the argument, jealousy was not the predetermination for the stabbing. Rather, what was involved in the moment was a beating and an attempt to stop it. Jerry was not killed because Gwen was jealous of his girl friend. He was killed because Gwen was attempting to stop an unlawful beating.

To support its argument that Gwen killed Jerry because she was jealous of Jerry's girl friend, the State states in its brief: "Defendant told Officer Dwyer that she stabbed Jerry because they had an argument about his girlfriend." The fact is, however, that the supplemental record plainly establishes that Gwen did not make that statement. Rather, the supplemental record shows that Officer Dwyer, a witness for the State, volunteered the statement in what appears to be a Procrustean attempt to support the State's theory of the case. It was Officer Dwyer's own statement which the State attributes to Gwen.

The supplemental record provides that the following occurred during the cross-examination of Officer Dwyer:

"Q. During this conversation that you had with Miss Evans, you talked about what happened that night?

A. Yes, ma'am.

Q. You did not talk to her about her marriage with J.D., did you?

A. No, ma'am.

Q. You did not ask her what her relationship was like with him, did you?

A. No, ma'am.

Q. You didn't ask Miss Evans how J.D. treated her, did you?

A. She did mention that he went out for chicken wings for lunch for her.

Q. No. I mean in the past, detective.

A. No, ma'am.

Q. Detective, when she told you that she stabbed him, you didn't ask her how she felt when she stabbed him?

A. No, ma'am.

Q. You didn't ask her how she felt when he hit her?

A. No, ma'am.

Q. You didn't really ask her why she stabbed him?

A. She told me why she stabbed him.

Q. Because he was hitting her?

A. They had an argument about his girl friend.

Q. Detective, you show me in this report where it says that she stabbed him because of the argument with his girl friend?

PROSECUTOR: Objection.

THE COURT: Basis?

PROSECUTOR: Improper impeachment.

THE COURT: It is sustained as to that.

DEFENSE COUNSEL:

Q. Detective, did you put in your report that she told you she stabbed him because of his girl friend?

A. She told me that they had an argument about his girl friend, and she stabbed him.

Q. She didn't tell you why she stabbed him?

PROSECTOR: Objection.

THE COURT: It is sustained.

Q. You didn't ask her why she stabbed him?

PROSECTOR: Objection.

THE COURT: It has been asked and answered.

DEFENSE COUNSEL: It has not been answered, your Honor, if I may.

THE COURT: You may pursue another line, but as to that particular question, it will be sustained.

DEFENSE COUNSEL:

Q. Detective, Miss Evans told you they had an argument about J.D.'s girl friend?

PROSECUTOR: Objection.

THE WITNESS: Yes.

PROSECUTOR: I will withdraw that.

THE COURT: All right.

DEFENSE COUNSEL:

Q. And later in that conversation she told you she stabbed him?

PROSECUTOR: Objection. Asked and answered.

DEFENSE COUNSEL: Judge, I have one more question.

PROSECUTOR: I will withdraw it for the sake of brevity.

DEFENSE COUNSEL:

Q. And later in that conversation she told you that she stabbed him?

A. Yes, ma'am.

Q. She did not specifically tell you, detective, that she stabbed him because of his girl friend?

PROSECUTOR: Objection. Asked and answered.

THE COURT: Overruled. It is a different question. You may answer it.

THE WITNESS: She told me about the argument and later told me that she stabbed him.

DEFENSE COUNSEL:

Q. You are making the connection that she stabbed him because of his girl friend?

PROSECUTOR: Objection.

THE WITNESS: Of course."

Plainly, the supplemental record does not support the State's claim that "Defendant told Officer Dwyer that she stabbed Jerry because they had an argument about his girlfriend." The State's claim is clearly unfounded and misleading.

In another effort to support its argument that Gwen killed Jerry because she was jealous of his girl friend, the State states in its brief: "Defendant also included in her statement given to an Assistant State's Attorney, '(Jerry) and I got into a fight about him taking his girlfriend to Cub Foods.'" The record clearly shows, however, that the State has taken the statement out of context and distorted the meaning of what was said. The statement attributed to Gwen does not support the State's argument that she killed Jerry because she was jealous of his girl friend.

Initially, it should be noted that the statement is part of a written summary by the assistant State's Attorney as to what Gwen said without benefit of counsel being present. The part of the summary statement that is pertinent here provides that Gwen said:

"Earl came home and said J.D. just dropped him off. I called home and talked to J.D. Then I went home. When I came in J.D. was in the living room. J.D. and I got into a fight about him taking his girl friend to Cub Foods. J.D. said he was a grown man and could do whatever he wants or can do whatever he wants. We kept arguing. J.D. hit me with his hand. He went around the table. I saw the knife on the table, picked it up and stabbed him. I don't know how many times I stabbed him. I just chopped at him. Then I ran. J.D. ran after me. He fell on the back porch by the steps. J.D. was calling Gwen, Gwen. J.D. was bleeding. I went back and said get up, get up. J.D. didn't get up. I ran in the house and got the blanket. I put his head on my lap. That is how I got the blood on my jeans. J.D.'s eyes started rolling. I went and called Earl and the police. After I stabbed J.D. I dropped the knife."

It is clear from the textual content of the summary statement that Gwen did not say or imply that she stabbed Jerry because she was jealous of Jerry's girl friend. Rather, she said and implied that she stabbed Jerry only after he hit her and that he was coming around the table to continue the beating. It is a distortion of the summary statement to claim that Gwen said she stabbed Jerry because she was jealous of Jerry's girl friend.

The State also argues: "It is clear from the record that defendant used an unreasonable and unnecessary amount of force in allegedly protecting herself from her husband and, therefore, killed him without lawful justification." The record, however, does not substantiate that thesis.

In examining the State's contention, we first address the fact that Jerry was not armed. On this point, the law does not require that the aggressor be armed in order that the use of a deadly weapon to stop the attack be justified as self-defense. Where it is clear that the aggressor is capable of inflicting serious bodily harm on the defendant without the use of a deadly weapon, and it appears that he intends to do so, then it is not necessary that the aggressor be armed for the defendant to employ deadly force in self-defense. *People v. Estes* (1984), 127 Ill. App. 3d 642, 652, 469 N.E.2d 275, 283.

■ In the present case, it is clear that Jerry was capable of inflicting serious bodily harm on Gwen without the use of a deadly weapon, and it appears that he intended to do so. Thus, the fact that Jerry was not armed does not mean that Gwen used an unreasonable or unnecessary amount of force when she stabbed him to stop the attack.

Next, we specifically address whether Gwen used an unreasonable and unnecessary amount of force in protecting herself from the attack. When a woman is threatened with violence by a physically

larger man, she does not have time to muse about how much force is reasonable or necessary to quell the attack, subdue the attacker and provide for her escape. Moreover, the attack may escalate. We must also bear in mind that she is not involved in a sporting event where there are umpires or referees and a "time-out" may be called so that a reassessment of the threat may be made.

As a result, the law does not require that a woman exercise infallible judgment when she uses deadly force to repel her attacker if she has reasonable grounds to believe that she is in danger of suffering great bodily injury or losing her life. Rather, the law only requires that she use reasonable judgment under the existing circumstances. Moreover, reasonable judgment under the existing circumstances means that a woman's right of self-defense arises before she is caused to spout blood. *People v. Estes* (1984), 127 Ill. App. 3d 642, 653, 469 N.E.2d 275, 284; *People v. White* (1980), 87 Ill. App. 3d 321, 323, 409 N.E. 2d 73, 75.

Thus, the question in a case such as this is whether the deadly force used by the woman was necessary and reasonable, taking into account such facts as (1) the attacker's apparent mental state and sobriety, (2) the woman's apparent mental state and sobriety, (3) the difference between the physical attributes and apparent strengths of the attacker and the woman, (4) whether the attacker has physically or verbally abused and threatened the woman on prior occasions and to what extent the threats were carried out, (5) whether the attacker was the apparent aggressor, (6) what recourse and what options were readily available to the woman to quell the attack during the course of the attack, and to escape, (7) the nature and extent of the attack, (8) the weapon that was used by the woman to stop the attack, (9) the apparent escalation or diminishment of the attack at the time the woman resorted to deadly force, and (10) the reasonable apprehension of the woman at the time the deadly force was used, which encompasses the fact that she is a victim of battered woman's syndrome.

When these 10 factors are applied to the facts in the present case there is no question that the deadly force that was used by Gwen was necessary and reasonable to save herself from serious bodily harm or from a serious threat of her life. Jerry was 6 feet, 230 pounds and physically well developed. Gwen is four inches shorter and almost 100 pounds lighter. When Gwen came home on the night of the occurrence it was close to midnight. Jerry was standing in the living room and he looked like a wild man. His eyes were bugged, he was sweating and his hair was standing straight up. He looked mad.

In addition, Jerry was drunk. The fact that he was drunk at the time cannot be disputed or even doubted. The autopsy report provides

that he had a blood-alcohol level .243, which is substantially above the level for intoxication under the law. (See 625 ILCS 5/11—501 (West 1992).) The police testified that Gwen was not drunk.

Moreover, Jerry was following a pattern of verbal and physical abuse and threats. For years, Jerry would verbally brutalize and physically beat Gwen. He would tell her, "fuck you bitch," and he would repeatedly call her a "bitch" and a "mother-fucking ass." He told her that he was going to "break her mother-fucking neck." He hit her with such objects as a shovel, a baseball bat and a skillet. He beat her with his fists and spit on her. He also threw objects at her. As a result of the physical abuse by Jerry, Gwen suffered physical injuries, such as a broken shoulder, a "punched-out" tooth that was swallowed, and a leg injury and back abrasions. After one particular beating, she thought her neck was broken and went to Michael Reese Hospital. These facts demonstrate that Gwen was a victim of battered woman's syndrome and that Jerry had the apparent potential to carry out his threats.

At trial, Gwen testified that on the night of the occurrence Jerry kept spitting in her face, and that he hit her in the back of the head and "kept on hitting, kept on hitting." She also testified: "I had my head down. I was closing my eyes, I looked down on the floor, and I seen that knife down there. So I picked the knife up and I just started stabbing and I was just stabbing at him and stabbing and just kept on swinging my arms, kept swinging my arms back there, and he kept on hitting me."

Surely, at the time of the occurrence the attack on Gwen was escalating, and she had a reasonable apprehension that she was in immediate danger of serious bodily injury and that her life was in jeopardy. Also, it is plain that the entire matter was spontaneous, and the grabbing and use of the knife reasonably appears to have been Gwen's only recourse to stop the beating and escape. Under the circumstances, it is clear that the deadly force used by Gwen was not unreasonable or unnecessary.

Although there are some discrepancies between Gwen's trial testimony and the initial statements that she made following the occurrence, the discrepancies do not negate the fact that she did not use an unreasonable or unnecessary amount of force to stop the attack. Thus, the State's contention on this point is unavailing.

The State next argues that "another indication that defendant did not kill her husband in self-defense is her initial attempt to cover-up the crime." In this context, the State states: "Defendant lied when she told the 911 operator that, 'some dudes stabbed her husband.' Later, defendant lied again when she told Officer Cosgrove,

'my husband left the apartment to get some cigarettes, he got to the alley, and then ran back upstairs holding his chest yelling 'Gwen, Gwen.' " When the statements relied upon by the State are read in their context as set forth in the factual text of our discussion of this case, it is clear that the statements are insignificant or of minuscule significance, at best, with respect to whether Gwen was acting in self-defense at the time she stabbed her husband.

The State also states: "Defendant attempted to hide the blood-stained knife in a dresser drawer. Defendant attempted to conceal her involvement in the crime by changing out of her bloodsoaked blue jeans before the police arrived. These actions would be illogical and unnecessary for someone who believed she took another life in self-defense." The problem with what is stated by the State is that it is nothing more than hyperbole founded upon pure tendentious speculation.

■ Although the bloodstained knife was found in a dresser drawer by the police, there is no evidence that Gwen was attempting to hide the knife. Gwen had not "cleansed" the knife or wiped it for fingerprints before the police arrived. Moreover, Gwen had not been asked the whereabouts of the knife before it was found by the police. The State's claim is untenable.

The State's contention that Gwen attempted to conceal her involvement in the crime by changing out of her bloodsoaked blue jeans before the police arrived is also untenable. The fact that the blue jeans were bloodsoaked is itself ample reason to change out of them. In addition, the bloodsoaked blue jeans were found by the police on the bed in open view while Gwen was on her way to the hospital. Under the circumstances, to say that Gwen was attempting to conceal her involvement in the crime by changing out of her blood-soaked blue jeans is nonsense.

On this same point, the State says: "Finally, at the police station, defendant told the detectives the truth when she stated that she stabbed Jerry because 'they had an argument about his girlfriend.' " We have already discussed the fact that what the State quotes as being said by Gwen was not a statement made by Gwen, but rather, it was Officer Dwyer's own statement. The State's repeated attempt to use the statement of Officer Dwyer as if it was a statement made by Gwen reflects poorly upon the State's handling of this case.

In its last thrust to demonstrate that it proved beyond a reasonable doubt that Gwen was not acting in self-defense, the State says: "Finally, defendant's testimony at trial was not credible. Her testimony concerning her actions in picking up the knife and how the stab wounds occurred was not consistent with Dr. Kalelkar's

testimony about how the stab wounds would have had to occur with regard to the position of defendant in relation to Jerry and the thrust of the knife at a 'downward angle.' Defendant said in her statement, 'I saw the knife on the table,' but later testified she 'saw the nine-inch knife on the floor.' There is testimony defendant 'swept the floor' earlier in the day, but somehow the knife apparently remained on the floor. One would think defendant would remember where she obtained the knife she supposedly used to protect herself."

The State does not refer to a record page with respect to its reference to the testimony of Dr. Kalelkar. Dr. Kalelkar was called as a witness by the State. The record reflects that he testified on direct examination as follows:

"Q. Doctor, what type of angle was this wound, the upper right hand corner, the one in the upper chest?

A. The angle is from left to right of the deceased and in a downward motion.

* * *

Q. And what type of a cutting action would be caused by the wounds in the center of this photograph?

A. The action is that the knife or the weapon is plunged into the body and then when it is removed from the body is dragged along the skin. That is why there is a slash mark on the lower corner of that stab wound.

Q. Is that wound also a downward angle?

A. Yes.

Q. And the far right hand corner of the photograph, which is the deceased's left arm, is there any discernable angle to that wound?

A. It is the same angle again, downward, probably downward angle because there is a slash mark again at the bottom of it.

* * *

Q. Doctor, do you have an opinion based on a reasonable degree of medical and scientific certainty as to the cause of the death of Jerry Evans?

A. Yes, I do.

Q. Can you please tell us what that is?

A. Yes. In my opinion Mr. Evans died as a result of multiple stab wounds.

Q. And do you have an opinion as to the manner of death?

A. Yes.

Q. What is that?

A. Homicide."

On cross-examination, Dr. Kalelkar, testified as follows:

"Q. You stated that the stab wounds had a downward angle and a left to right?

A. Right.

Q. Left to right would be consistent with the person using the knife on Mr. Evans as being right handed?

A. Correct.

Q. And the downward angle would be consistent with the person using the knife being shorter?

Q. Well, yes, that is consistent with the person being shorter because that person is reaching up.

* * *

Q. Would you explain what a slash wound is?

A. We don't usually describe a wound as slash wound. We call it incised wound. An incised wound is longer on the skin surface than it is deeper.

Q. That would be consistent with someone reaching up and making a move like this (indicating), is that correct?

THE COURT: Do you want to state for the record?

A. I am showing my right arm, moving from an upward to downward or sideward angle.

Q. The injury on the arm, what kind of injury—it was a stab wound. Was it also consistent with a slashing motion?

A. Yes, it was because there is a mark at the bottom of the stab wound which shows that the knife was pulled against the skin.

Q. And the other injuries on the chest, do those also show signs of a slash?

A. Yes, particularly the wounds on the middle of the chest.

* * *

Q. And the scrape that he has on his face and on his shoulders, that might be consistent with falling on the ground?

A. Yes.

* * *

Q. So at best you cannot say exactly where his arms were or what he was doing at the time he was being stabbed?

A. That is correct."

We have set forth above all of the pertinent testimony and opinions testified to by Dr. Kalelkar. The pertinent testimony of Gwen is as follows:

"When he was in my face, he started spitting in my face. I said, J.D., get out of my face. Stop spitting on my face. He say, you don't tell me what to do. He started to spit—a whole lot of spit started coming on my face.

So I took his forehead, that is when he hit me in the back of my head and kept on hitting, kept on hitting. I had my head down.

I was closing my eyes, I looked down on the floor, and I seen that knife down there. So I picked the knife up and I just started stabbing and I was just stabbing at him and stabbing and just

kept on swinging my arms, kept swinging my arms back there, and he kept on hitting me.

Then he said, you old red bitch, you done stabbed me. I'm going to break your mother-fucking neck. So I dropped the knife. That is when I ran down the back steps.

\* \* \*

\*\*\* Then I heard something say boom. So then I started tippy toes out because I didn't know if he was going to jump out of somewhere or what. I ain't seen him over there where the steps was at, and then I looked over that way and that is the garage over there, the roof, and he was laying over there."

Plainly, the record belies the State's contention that Gwen's "testimony concerning her actions in picking up the knife and how the stab wounds occurred was not consistent with Dr. Kalelkar's testimony about how the stab wounds would have had to occur with regard to the position of defendant in relation to Jerry and the thrust of the knife at a 'downward angle.' " The State's contention is not only unfounded, it is also misleading.

■ In addition, the State's reference to whether the knife was on the table or on the floor and the reference to the floor having been swept are insignificant references within the assemblage of facts and circumstances that are involved. Surely, it makes no difference in this case whether the knife was on the table and fell to the floor and grabbed by Gwen, or whether it was grabbed off the table by Gwen. This case involved a real-life highly volatile set of facts and emotions. Under the circumstances, pinpoint accuracy and precise recollection of the mercurial moments cannot and in reality should not be expected.

■ Lastly, as part of its argument that Gwen's testimony at trial was not credible, the State states in its brief: "Defendant lied to the Illinois Department of Public Aid in order to receive $154 a month." What the defendant said to or did with the Illinois Department of Public Aid has absolutely no bearing on whether her testimony at trial was credible or on whether the State proved beyond a reasonable doubt that she was not acting in self-defense.

The State's reference to defendant's receipt of public aid to discredit her trial testimony makes us mindful of the penumbral circumstances that perhaps may be an integral part of this case. Gwen is an economically poor African-American who lived in a part of the community that may appropriately be described as the "low-end." Based on the record here, it is a high crime area where the police may not always respond to telephone calls reporting domestic violence.

The public services that are provided in the area are apparently demonstrated by what occurred when the paramedics proceeded to remove Jerry from the scene to take him to a hospital in an effort to save his life. A paramedic dragged Jerry down the steps with his head repeatedly bouncing on the steps as he was being taken from the scene, although he was bleeding and near death. Moreover, the incident occurred at about midnight on December 10, 1988, and Jerry was pronounced dead in the early morning hours on December 11, 1988. Within hours, on December 11, 1988, a complaint was filed charging Gwen with first degree murder.

These kinds of circumstances place a heavy burden on judges to make sure that our system of justice gives equal treatment to defendants coming from the "low-end" as they do for defendants coming from more affluent areas. This is just an added reason why the record in this case must be scrutinized befitting a biblical exegete.

When the record is carefully scrutinized and all of the evidence that is gleaned is taken together as a whole, neither the State's theory nor its contentions and arguments can bear water. At best, the State's theory, contentions and arguments leave far too much room for doubt.

We are cognizable of the principle that a reviewing court must view the evidence in the light most favorable to the prosecution when a conviction is challenged on the basis that the State did not prove the defendant guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) We are also aware, however, that on the issue of self-defense a reviewing court has a duty to reverse the conviction when the evidence is so unsatisfactory as to raise a serious doubt as to the defendant's guilt. See *People v. Estes* (1984), 127 Ill. App. 3d 642, 651-53, 469 N.E.2d 275, 282-84; *People v. Reeves* (1977), 47 Ill. App. 3d 406, 409, 362 N.E.2d 9, 12.

Self-defense is an affirmative defense and, once it has been raised, the State has the burden of disproving it beyond a reasonable doubt. The test to be applied is whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm or threat of life and whether the force used was reasonable and necessary. See *People v. Goodman* (1979), 77 Ill. App. 3d 569, 574-75, 396 N.E.2d 274, 277; *People v. Moore* (1976), 43 Ill. App. 3d 521, 527, 357 N.E.2d 566, 570.

Here, considering all of the evidence taken together as a whole and in the light most favorable to the prosecution, the State did not prove beyond a reasonable doubt that Gwen's use of deadly force was unreasonable or that the force she employed was unreasonable or un-

necessary. Clearly, the evidence is so unsatisfactory as to raise a serious doubt of her guilt. The conviction must therefore be reversed. (*People v. Estes*, 127 Ill. App. 3d at 653-55, 469 N.E.2d at 284-85; *People v. Reeves*, 47 Ill. App. 3d at 412, 362 N.E.2d at 14.) Since the conviction is reversed, we do not consider the alleged trial errors that are raised.

Accordingly, the judgment of conviction is reversed.

Reversed.

CERDA and GREIMAN, JJ., concur.

## ADDENDUM

Our opinion was filed on March 9, 1994. After the opinion was filed, we learned for the first time that Gwen had died on March 16, 1993, while she was in prison for her conviction of first degree murder. Under the circumstances, rather than reversing the judgment of conviction, we remand the case to the circuit court to vacate the judgment of conviction and to dismiss the indictment.

Remanded to the circuit court with directions.

CERDA and GREIMAN, JJ., concur.