2022 IL App (2d) 210074-U
No. 2-21-0074
Order filed August 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-421 |
| JONATHAN CELIS, | ) ) | Honorable Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Hudson concurred with the judgment.

**ORDER**

¶ 1   *Held*:  (1) There was sufficient evidence to prove defendant guilty of first-degree murder and we decline defendant's invitation to reduce his conviction to second-degree murder; (2) the trial court did not abuse its discretion in declining to issue a serious-provocation instruction; and (3) it was not error for the court to issue the pattern jury instruction regarding the use of force by an initial aggressor.

¶ 2   Following a jury trial, defendant Jonathan Celis was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) in the stabbing death of Oscar Castaneda outside of a restaurant in Waukegan. The trial court sentenced defendant to 32 years' imprisonment. On appeal, defendant contends that the evidence was insufficient to sustain his conviction for first-degree murder; he

also suggests that he was guilty of, at most, second-degree murder and that the trial court erred in its instructions to the jury. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4      The State's evidence in this case largely consisted of video footage of the crime scene and the ensuing police response. We recite only what is necessary to resolve this appeal.

¶ 5      On February 24, 2018, at around 2:00 a.m. police were dispatched to La Canoa restaurant in Waukegan, where a fight had broken out in the parking lot. Footage from the body-worn camera of Officer Anthony Paulsen was admitted into evidence. Upon arriving at the scene, one of the security guards from the restaurant, Aubrey Coleman, brought defendant to Paulsen and said that defendant had a knife and just stabbed someone during the fight. Defendant was wearing a distinctive brown checkered-patterned scarf and a gray jacket. His nose was bleeding.

¶ 6      In response to questions from Officer Paulsen, defendant denied stabbing anyone or possessing a knife. He also did *not* state that anyone else involved in the fight had a weapon. Three young men, who identified themselves as defendant's brothers, also told police defendant had been attacked. Defendant was taken into custody on an unrelated warrant.

¶ 7      The restaurant's video surveillance system captured the events that unfolded in the parking lot only minutes earlier. First, one of the young men who said he was defendant's brother, is seen exiting the restaurant and walking to the parking lot. Minutes later, defendant and his girlfriend are seen walking out behind two other women and next to another couple. The male of the couple, Roberto Amaro, appears to say something to defendant, and defendant and his girlfriend hang back. As defendant says something to Amaro, Amaro hits defendant in the face. Defendant and Amaro square up and defendant's "brother," who exited earlier, runs up and hits Amaro. From there, defendant, his "brother," and Amaro begin throwing punches.

¶ 8      More people exited the restaurant and a melee quickly broke out that involved around a dozen people including participants and onlookers in the parking lot. Then, Christian Morales briefly approached defendant and punched him in the face. Security guards, including Aubrey Coleman, came out of the bar and engaged the crowd. Defendant and his girlfriend backed away towards the parking spaces. A woman then ran up and punched defendant and his girlfriend, and Giovanni Diaz and defendant began to exchange punches. While Diaz and defendant were fighting, the victim, Oscar Castaneda, ran up and hit defendant from behind. Then, Diaz and Castaneda began punching and pulling defendant over by a decorative patio fence. Defendant broke free of Diaz and Castaneda but stumbled into the fence and fell down. (At trial, the parties stipulated that Amaro, Morales, Diaz, and Castaneda were members of the Latin Kings streetgang.)

¶ 9      The main portion of the fight was briefly broken up and defendant moved away from the fence and his three "brothers," two additional males (who appeared to be defendant's friends), and his girlfriend, surrounded defendant and held him up to support him and let him catch his breath. After nearly 40 seconds, Castaneda moved away from the fence and walked towards his girlfriend and past defendant and his group. Castaneda was yelling and pointing at defendant and his group but was clearly not holding a weapon. At this point, defendant had been removed from the fight for roughly one minute. As Castaneda was moving *away* from defendant's group, defendant charged at Castaneda. defendant used his left hand to try to grab a hold of Castaneda and lunged at Castaneda with his right hand four times stabbing him twice with a knife as Castaneda was turning around and continued to move away from defendant. Defendant then ran off with Coleman and others following behind him.

¶ 10     Castaneda was found on the parking lot pavement, a few feet from where he was stabbed, mostly unresponsive. One of the stab wounds pierced Castaneda's heart and cause his left lung to

collapse. The other pierced Castaneda's iliac artery and caused massive internal bleeding in his abdominal cavity. He was declared dead at Vista East Hospital. The medical examiner testified that each stab wound was fatal, and that Castaneda had bled to death.

¶ 11    Later at the police station, defendant spoke with Detective Dominick Capelluti for around 25 minutes. During the conversation, defendant acknowledged that he had a knife in his pocket and that he had stabbed Castaneda. It appears that at the time of the interview Castaneda's fate was not yet known and neither defendant nor Capelluti referenced Castaneda's condition. Near the end of the interview, Capelluti showed defendant a still photograph taken from the surveillance video and indicated that Castaneda was moving away from defendant's group when defendant ran up to him and stabbed him. Defendant acknowledged that Castaneda appeared to be in retreat and was not displaying a weapon, but defendant stated he was afraid of what Castaneda might do or that he might be armed.

¶ 12    Coleman testified that he was the head of La Canoa's security and that, earlier that night, he received a complaint from "a Spanish guy," who fit the description of Amaro, that defendant had touched another woman's rear end. Coleman saw Amaro in the fight in the parking lot. Later, Coleman saw defendant stab Castaneda, though he did not realize what had happened until he saw blood dripping from defendant's knife.

¶ 13    Defendant's girlfriend, Amairani Garcia, testified that she warned defendant that she saw a knife before Amaro threw the first punch. On cross-examination, however, Garcia admitted that she could not spot a knife in anyone's possession in the videos. Garcia also testified that she did not see defendant with a knife and did not see defendant stab Castaneda.

¶ 14    The police found a knife in the parking lot, which defendant admitted was his. In addition, the State also introduced a recording of Garcia's interview with Detective Capelluti on the night

of murder, wherein Garcia stated that the knife the police recovered from the parking lot belonged to defendant.

¶ 15     Defendant testified that he and Garcia went to La Canoa that night for karaoke with friends. Outside, defendant said that the individuals in the parking lot were flashing gang signs and he heard Garcia say that someone, who fit Castaneda's description, had a knife. Defendant stated that when Castaneda hit him, he was afraid and wanted to "defend" himself, so he stabbed Castaneda with the knife, and later threw his knife in the parking lot.

¶ 16     After the close of evidence, the trial court found that the parties had sufficiently raised the issue of self-defense and imperfect self-defense and instructed the jury on the possibility of acquittal as well as second-degree murder (720 ILCS 5/9-2(a)(2) (West 2018)), using Illinois Pattern Jury Instructions, Criminal, (hereinafter IPI Criminal No. ___) No. 7.05 (app. July 18, 2014). The trial court, however, refused defendant's request to instruct the jury on sudden and intense passion under IPI Criminal No. 7.03. Finally, over defendant's objection, the trial court issued the second paragraph of IPI Criminal No. 24-25.09 on the limited circumstances in which an initial aggressor's use of force may be found justified. The State asserted, and the court agreed, that the instruction was appropriate because defendant stabbed Castaneda while he was retreating.

¶ 17     The jury found defendant guilty of first-degree murder. Defendant filed a posttrial motion in which he preserved his claim regarding IPI Criminal No. 7.03 (sudden and intense passion), but not IPI Criminal No. 24-25.09 (initial aggressor's use of force). The trial court denied the motion and as noted, sentenced defendant to 32 years' imprisonment. Defendant appeals.

¶ 18                                        II. ANALYSIS

¶ 19     Before this court, defendant contends that (1) the evidence was insufficient to sustain his conviction for first-degree murder, (2) the trial court erred in not instructing the jury using IPI

Criminal No. 7.03 (sudden and intense passion), and (3) the trial court committed plain error when it instructed the jury using IPI Criminal No. 24-25.09 (initial aggressor's use of force). We agree with the State that none of these issues has merit.

¶ 20    We begin with defendant's contention that the evidence was insufficient. In assessing the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.), *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As defendant notes, "on the issue of self-defense a reviewing court has a court has a duty to reverse the conviction when the evidence is so unsatisfactory as to raise a serious doubt as to the defendant's guilt. *People v. Evans*, 259 Ill. App. 3d 195, 216 (1994). In this case, we have no such doubts.

¶ 21    On the sufficiency of the evidence, defendant's primary argument is that the State failed to disprove the reasonableness of his use of deadly force. We disagree. As the State notes, the controlling principles are well established. To raise a claim of self-defense, "the defendant must establish some evidence of each of the following elements: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable. [Citations.]" *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). "If the State negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail [and] the trier of fact must *** find the defendant guilty of either first or second degree murder." (Emphasis in original.) *Id*. at 128.

¶ 22    As both parties note, while "the right of self-defense arises before the first blood is drawn[,]" "[t]he question in a case such as this is whether on the basis of quickly unfolding events

the defendant's response was reasonable under the exigencies that existed at the moment." *People v. White*, 87 Ill. App. 3d 321, 323 (1980). Here, defendant relies on the fact that he was initially attacked by Amaro, and then attacked *ad seriatim* by Diaz and Castaneda. (Defendant's brief fails to mention Morales, who punched defendant in the face once, but his observation that he was attacked first is nevertheless valid.) Yet as defendant *also* notes, "[he] was repeatedly removed from the conflict" at several points during the fight.

¶ 23     One of those interludes in which defendant was removed from the conflict happened just before Castaneda was stabbed. Prior to that, defendant was pulled back from the melee and surrounded by three of his "brothers," two acquaintances, and his girlfriend. Defendant was removed from the conflict for nearly 50 seconds before he charged at Castaneda, who was moving *away*, used his left hand to steady him, and lunged at him four times with his right hand, stabbing Castaneda twice. As noted, the medical examiner testified that either stab wound would have been fatal and the video shows that Castaneda was unarmed.

¶ 24     All of the cases defendant relies on are distinguishable, as here, there is a video of the fight leading up to the stabbing as well as the stabbing itself. The video shows that at no time did Castaneda present a mortal danger to defendant up to and including the moment when defendant began stabbing him.

¶ 25     Defendant appears to have conflated the issue of whether a jury instruction on self-defense and imperfect self-defense was warranted with whether either of those outcomes was, in fact, the proper verdict. See *People v. McDonald*, 2016 IL 118882, ¶¶ 23-25 (noting that only slight evidence is required to issue a self-defense instruction). Regardless, our Criminal Code provides that a person "is justified in the use of [deadly] force *** *only if* he *reasonably* believes that such

force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Emphasis added.) 720 ILCS 5/7-1 (West 2018).

¶ 26    We agree with the State that, at the time defendant charged at Castaneda and used deadly force, *defendant* was the aggressor, not Castaneda. Defendant had been removed from the conflict for nearly one minute and was safe, surrounded by his friends and putative brothers. In fact, at the time defendant began to attack him, Castaneda largely had his back turned towards defendant. Thus, while Castaneda was pointing at defendant and those surrounding him with his fingers, he did not pose an *imminent* threat to defendant or anyone else. *Cf. Jeffries*, 164 Ill. 2d at 127-28. Indeed, defendant stated as much when he acknowledged to Detective Capelutti that he stabbed Castaneda while Castaneda was moving away from defendant and his group. See, *e.g.*, *People v. R.C.,* 108 Ill. 2d 349, 356 (1985) (noting that "a confession is the most powerful piece of evidence the State can offer"). Consequently, a reasonable trier of fact could have found that defendant was guilty of first-degree murder, that defendant's use of force was unreasonable, and that a conviction on second-degree murder based on imperfect self-defense, or an acquittal based on complete self-defense, simply was not warranted.

¶ 27    Defendant's second contention is that the trial court erred when it refused to instruct the jury using IPI Criminal 7.03 on serious provocation as an alternative route to a second-degree murder conviction (see 720 ILCS 5/9-2(a)(1) (West 2018)). We review a claim of jury-instruction error for an abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 38; *People v. Jones*, 219 Ill. 2d 1, 31 (2006).

¶ 28    Our supreme court has recognized only four scenarios that constitute serious provocation. They are (1) substantial physical injury or substantial physical assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *McDonald*, 2016 IL 118882,

¶ 59. We note that the statutory requirement concerning serious provocation is that second-degree murder is at issue when, "[*a*]*t the time of the killing* [the defendant] is acting under a sudden and intense passion resulting from serious provocation *by the individual killed* \*\*\*." (Emphasis added.) 720 ILCS 5/9-2(a)(1). Thus, before we can consider whether the case at hand fits into one of the four categories recognized by our supreme court, we must first consider whether there was slight evidence that Castaneda had seriously provoked defendant "at the time of the killing \*\*\*."

¶ 29    Like the trial court, we cannot find that there was any evidence Castaneda presented an imminent threat to defendant at the time defendant began to use deadly force. Again, at this point in the fight, defendant had been physically removed from the conflict for near a minute, and Castaneda was moving away from defendant at the time. Castaneda could not have reasonably presented a threat of substantial physical injury to defendant, nor were the two actively engaged in any sort of " 'mutual combat,' " which requires that the parties "fight upon equal terms \*\*\*." *McDonald*, 2016 IL 118882, ¶ 59 (citing *People v. Austin*, 133 Ill. 2d 118, 125 (1989)). Again, defendant was armed and charged at Castaneda, who was unarmed and had his back largely facing defendant at that moment. This simply was not a circumstance of serious provocation.

¶ 30    Moreover, we reject defendant's assertion that the conflict "allow[ed] no time for [his] passions to cool." As noted, defendant was withdrawn from the conflict for nearly a minute prior to exiting safety and charging at Castaneda, almost entirely from behind, with a blade in his hand. Further, Castaneda was moving away from defendant and was largely isolated, and not near any portion of the fight. Thus, contrary to defendant's suggestion, he *did* have time to cool his passions, he just chose not to.

¶ 31    We determine that the trial court did not abuse its discretion when it refused to instruct the jury on serious provocation for second-degree murder. Consequently, for the same reasons, we

also reject defendant's suggestion that we should use our power under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) to enter a conviction on second-degree murder based on serious provocation. See also *People v. Newbern*, 219 Ill. App. 3d 333, 359 (1991) (repeating observation that "statutory scheme for homicide 'does not readily lend itself to reductions in degree' on appeal").

¶ 32     Defendant's final contention is that the trial court committed plain error when it instructed the jury using the second paragraph of IPI Criminal No. 24-25.09, regarding the law on an initial aggressor's use of force. As noted, defendant concedes that he has forfeited review of this claim by failing to raise it in his post-trial motion, but nevertheless asks that we review his claim under the plain-error doctrine. See *People v. Sargent*, 239 Ill. 2d 166, 188-89 (2010). Of course, a necessary antecedent to invoking the plain-error doctrine requires that we determine whether any error occurred at all. *Id*. at 189.

¶ 33     Defendant suggests that giving the second paragraph of IPI Criminal 24-25.09 in this case was confusing and misleading. We disagree. The instruction stated as follows:

> "A person who initially provokes the use of force against himself is justified in the use of force only if *** in good faith, he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

This instruction was given in addition IPI Criminal 24-25.09X, which informed the jury that a non-initial aggressor "has *no duty* to attempt to escape the danger before using force against the aggressor." (Emphasis added.)

¶ 34     According to defendant, giving both IPI Criminal 24-25.09 and 24-25.09X together "likely confused the jury as it implied that the defendant was the initial aggressor and may have had some

duty to retreat." That claim is somewhat puzzling given the circumstances of this case. Here, the State argued at both the jury instruction conference and in closing argument that it was for the jury to determine whether Castaneda was the initial aggressor throughout this entire episode or whether defendant subsequently became the initial aggressor during a distinct second phase of the conflict, after he darted from safety and towards Castaneda. Both the State and the trial court felt that it would have been inappropriate to have the jury instructed on imperfect and complete self-defense while at the same time *not* telling the jury the legal parameters that applied to an initial aggressor's use of force and that there is no duty to retreat before countering an attack. The instructions fully and fairly informed the jury of the law applicable to *both* parties' theories of the case. Furthermore, there was no real danger of juror confusion on the issue of whether there was a duty to retreat as IPI Criminal 24-25.09X informed the jury that there was no such duty. Accordingly, it was not error, let alone plain error, to instruct the jury using the second paragraph of IPI Criminal 24-25.09.

¶ 35                                   III. CONCLUSION

¶ 36    For the reasons stated, we reject defendant's contentions of error and affirm the judgment of the circuit court of Lake County.

¶ 37    Affirmed.