THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES NATHANIEL DAVIS, JR., Defendant-Appellant.

First District (3rd Division)    No. 1—93—0977

Opinion filed March 13, 1996.

William J. Kunkle, Jr., and Michael I. Leonard, both of Pope, Cahill & Devine, Ltd., of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

A jury found defendant, James Nathaniel Davis (Davis), guilty of first-degree murder and residential burglary. On appeal, he contends that he was not proven guilty beyond a reasonable doubt. We agree. We therefore reverse the judgment of conviction.

The homicide victim was Diane Davis (Diane). Davis married Diane on November 1, 1968. He was 41 and she was 25 years old. It was his second marriage; he had three children from his first marriage. Before, and during, his marriage to Diane, Davis was employed as president of a family owned insurance company. In 1969, Davis and Diane bought a home (the Kenilworth home) located at 150 Oxford Road in Kenilworth, Illinois. Two children were born from their marriage; Marie was born in 1971, and Nathaniel was born in 1973.

In 1984, Diane filed a petition for dissolution of the marriage in the circuit court of Cook County. Diane and Davis continued to live in the Kenilworth home for about two years, but they slept in separate bedrooms. In July 1986, Davis moved from the Kenilworth home to a townhouse (Northbrook townhouse) at 738 York Court in Northbrook, Illinois. While the divorce case was pending, in September 1986, the parties signed a joint parenting agreement. Diane had primary physical custody of the children but Davis had physical custody in the summer months.

Diane dated several men. In March 1988, she began to date Frank Fitch. In 1989 and 1990, Fitch lived with Diane, Nathaniel and Marie at the Kenilworth home. Diane's co-habital relationship with Fitch continued until May 1990 when Diane ended the relationship. In June 1990, Diane had an alarm system installed in the Kenilworth home. In October 1990, Diane's relationship with Fitch was rekindled and they dated until December 1990, when she told Fitch that their relationship was over because she did not want to get AIDS. Diane was subpoenaed to give her deposition in Fitch's divorce case. Fitch's wife at the time pressed battery charges against him, and he pled guilty. Fitch was also known to own guns.

During the course of his relationship with Diane, Fitch had free rein of the Kenilworth home. He had a key to the house and knew the alarm code. There were also others who had a key to the house and knew the alarm code.

The alarm system at the Kenilworth home included an alarm for entry to the house, as well as a motion detector within the house. The motion detector was located on the stairway leading from the basement to the first floor. It was set to trigger the alarm if someone walked on the first or second step from the top of the basement stairs.

The alarm system included an on/off alarm pad inside the house, next to the side door, which is the main entrance. A four-digit code was used to arm or disarm the system. In order to arm the system, one had to press the code on the alarm pad. The motion detector would not be armed, however, unless a button on the alarm pad was pressed prior to the code being pressed.

If the alarm system was breached other than by opening the main entrance door, the system would instantly send a signal through the phone lines to a computer screen at a central reporting station, and someone there would dispatch the police. If the main entrance door was opened when the alarm system was armed, a loud warning sound would be generated in the house to alert anyone inside the house. The sound would continue until the person entering the house pressed the code on the alarm pad. If the correct code was not pressed within 30 seconds, the system would instantly send a signal through the phone lines to the reporting station.

Davis was never told the alarm code. Also, Diane told Nathaniel that she did not want him to tell or let Davis know the alarm code. On the infrequent occasions that Davis entered the Kenilworth home with Nathaniel, Davis would wait outside until Nathaniel pressed in the alarm code, and only then would Davis enter the house. Similarly, when Davis and Nathaniel left the house, Nathaniel would wait until his father left the house, and then he would press in the code to rearm the system.

On one occasion, however, on July 4, 1991, Davis was in the house somewhere behind Nathaniel while Nathaniel pressed in the alarm code to rearm the alarm system. At trial, the prosecutor did not pursue any questioning to determine whether Davis saw the code numbers. There is no testimony or evidence that Davis saw the code numbers that were pressed on that occasion or at any other time. In addition to there being no evidence that Davis actually saw or knew the alarm code, Davis did not have a key to the Kenilworth home. Also, after he moved out in 1986, Davis never went up to the second floor of the Kenilworth home.

Diane was killed by seven gunshot wounds while she was in her bedroom on the second floor of the Kenilworth home during or about the early morning of Thursday, July 25, 1991. At the time, Marie was living away at school in Boston, and Nathaniel was living with Davis at the Northbrook townhouse.

On Wednesday, July 24, 1991, Nathaniel and Diane had dinner together at the Kenilworth home. They then sat from 7 p.m. to 10 p.m. in a screened porch that was part of the house. Diane received a phone call. After the phone call, Diane told Nathaniel to pick up their dog from the kennel on Saturday because she was going to Wisconsin the next day to visit her aunt for a few days. Diane had purchased the dog after Davis moved out of the Kenilworth home in 1986.

After Nathaniel agreed to pick up the dog from the kennel on Saturday, he left the Kenilworth home and drove directly to the Northbrook townhouse and parked his car nearby. He arrived at the Northbrook townhouse at 10:40 p.m. Davis was home, and his car was parked inside the garage. The garage was directly below the bedroom in which Davis and Nathaniel slept.

Davis was in the upstairs bedroom, except when he went to the washroom, while Nathaniel watched television on the first-floor level until 11 p.m. Nathaniel then went upstairs to go to bed. He removed his wallet and key ring from his pockets, placed his clothes on the floor, and went to bed. Davis was already in bed. Nathaniel and Davis slept in the same bedroom in separate twin beds which were pushed together to resemble one king-size bed.

During the night of Wednesday and early morning of Thursday, Nathaniel was never awakened by any sound or movement from Davis. In addition, during that time Nathaniel never heard the electrically operated garage door open; the garage door was located directly below the bedroom and when it would go up or down it would make a noise and "vibrate" the bedroom. Nor did Nathaniel hear the sound of a car engine starting during the relevant night and early morning hours.

On Thursday morning, Nathaniel and Davis woke at 9 a.m. and had breakfast together. They spent an uneventful day and nothing unusual was noticed. On Friday, Nathaniel and Davis spent time and had dinner together. Nothing unusual was noticed. On Saturday morning, Nathaniel drove to the kennel about 8 a.m. to pick up Diane's dog. After being told that the dog was not there, Nathaniel drove to the Kenilworth home. After arriving, he tried using the automatic garage door opener but it did not work. He then opened the door and entered the house through the main entrance. The alarm did not sound.

While in the house, Nathaniel heard and saw the dog running about, and Nathaniel went upstairs to Diane's bedroom, where he saw Diane lying on the floor at the foot of the bed. Diane was lying in a fetal position with dried blood on her and on the floor. She had

been shot and killed. Some drawers had been pulled out of a dresser, some clothes were strewn on the floor, part of the bed covers were pulled back and a pillow was ruffled. Nathaniel phoned 911 and waited for the Kenilworth police to arrive. The police arrived at about 8:30 a.m. After the police arrived, Davis was contacted. Davis went to the Kenilworth home and was then taken to the police station, where he met Nathaniel.

At the police station, Davis had his first interview with the police. He was asked if he owned any firearms, and he said he owned "a 30 aught six rifle, a 30-30 lever action rifle, a twenty gauge shotgun, two 12 gauge shotguns and a .45 Colt replica." That same afternoon, Davis signed a consent form authorizing the police to search the Northbrook townhouse. During their search of the Northbrook townhouse, the police found the guns that Davis had described to them, in a gun cabinet that was accessible to anyone in the townhouse.

As part of their investigation, the police recovered six spent .38-caliber casings from Diane's bedroom; a seventh .38-caliber casing was found stuck to Diane's leg at the morgue. The police also removed six bullets from the bedroom; a seventh bullet was later recovered from Diane's body. All seven casings and bullets were fired from the same gun.

There were no signs of forced entry, and nothing was stolen. The police discovered, however, that the electrical breaker switches located in the basement had been turned off. The breaker switches controlled the electricity throughout the interior and exterior of the house, including the garage. The electrical clock on the kitchen range was stopped and displayed the time of 1:17.

The alarm system had a transformer that powered the system and kept the battery for the system charged. In the event of an electrical power failure, the battery instantly powered the alarm system. The battery, however, was only equipped to power the alarm system for a maximum of 20 hours. Before the battery would go completely out, the system was designed to send a message to the central reporting station indicating a low battery. There is no evidence in the record that the central reporting station had any indication of a low battery at any relevant time related to the homicide.

The electrical breaker switches did not affect the phones. A phone on a phone-clock-radio that was on a nightstand next to Diane's bed remained in operation. The digits on the clock indicated that the electricity had been turned off at 1:17.

While inspecting the back of the house on the outside, the police discovered that a phone line had been cut. The cut phone line was next to the screened porch in which Diane and Nathaniel sat on

Wednesday evening. The cut phone line only supplied service to the phone jack for the phone that was in the screened porch; it did not affect phone service to any other phones in the house. The police determined that the wire that had been cut did not affect the alarm system.

On August 1, 1991, Davis had a second interview with the police. The police asked him if he owned any handguns and he said that the only handgun that he owned was a .45 Colt replica that he bought at Bess Hardware in Northfield. When he was asked about the last gun that he had bought, he said that he purchased a 12-gauge shotgun automatic loader for his son, Nathaniel, from Bess Hardware. When the police asked him if he had ever inherited any guns, Davis said that he had inherited a handgun from his father but that he lost it while on a hunting trip in October 1987 in Colorado with a friend of his, Bill Bredemeier, from Northbrook. He said he did not remember the make or caliber of the handgun.

In October 1987, almost four years before Diane was killed, Davis had gone on a hunting trip with Bredemeier in Crested Butte, Colorado. Davis took his shotgun, his .45 Colt replica, and the handgun that he had inherited from his father, on the hunting trip. The handgun that he had inherited from his father was a .38-caliber Colt semi-automatic. Davis inherited the handgun in 1979 when his father died. Davis had never fired the handgun, but he wanted to try it out on the hunting trip.

Davis' son-in-law, Glenn Woelk, was also on the hunting trip. The group's guide was Donald Tuck. The group did some shooting at a gravel pit to sight their rifles. Bredemeier testified that neither he nor Davis fired any handguns while at the gravel pit or on the hunting trip. Woelk testified that when he, Davis and Bredemeier went to the gravel pit, Davis and Bredemeier had a couple of rifles and handguns. Woelk remembered that the rifles and handguns were shot, but he did not remember who shot which weapon.

On September 25, 1991, in a third interview with the police, Davis said that he last remembered seeing the handgun that he had inherited from his father when he packed it for the October 1987 Colorado hunting trip with Bredemeier. In addition, Davis told the police officers that he did not recall shooting the handgun in Colorado. He also said that he did not remember unpacking or seeing the handgun afterward. He said he discovered that the handgun was missing after he arrived home from Colorado.

On September 30, 1991, the police searched the Skokie Lagoon for the gun that was used to kill Diane; the search was a continuation of a search that began on August 28, 1991. No reason was given

as to why the search was initiated. The Skokie Lagoon is a body of water that covers an area within the boundaries of Glencoe, Northfield, Winnetka and Northbrook. During the course of their search, police divers looked near the south side of the Tower Road bridge in Winnetka. In the water, about 15 feet south of the bridge, the police recovered a .38 Colt semi-automatic handgun.

On May 2 and May 26, 1992, the police traveled to Crested Butte, Colorado, to search the gravel pit for spent cartridge casings. They were shown the location of the gravel pit by Glenn Woelk. After searching the gravel pit, the police recovered casings from two handguns, including casings from a .38 Colt semi-automatic handgun.

At trial, a police crime laboratory expert testified that, in his opinion, the gun casings from the gravel pit in Crested Butte, Colorado, and the seven gun casings and seven bullets that were involved in the homicide were fired from the .38 Colt semi-automatic handgun that the police recovered from the Skokie Lagoon. He testified, however, that the handgun had a broken spring and could not be fired again. In addition, he testified that the handgun did not contain any latent fingerprints. At trial and on appeal, Davis contests the opinion of the State's expert witness.

In addition to Davis, Fitch and Nathaniel were both suspects in the criminal investigation of Diane's death. A police crime laboratory expert was supplied blood samples from Davis, Fitch and Diane. He then analyzed a bedsheet that was on Diane's bed. He determined that there were semen stains on the bedsheet. The expert eliminated Davis as the donor but he was not able to eliminate Fitch as the donor. The expert also examined the mattress pad from Diane's bed and found a human bloodstain. Again, he eliminated Davis as the donor but he was not able to eliminate Fitch as the donor. Also, the expert examined a hair that was taken from the left hand of Diane. Again, he eliminated Davis as the donor; he was not given a sample of Fitch's hair for analysis or comparison.

In addition, the evidence is that after he moved out in 1986, Davis had never been on the second floor, which included Diane's bedroom, of the Kenilworth home. An expert from the police crime laboratory examined all the fingerprints that were found at the crime scene and determined that no fingerprint could be identified as being from Davis. The police did not find a single piece of evidence that placed Davis in, at or near the Kenilworth home on the day, evening or night of the homicide.

Davis' contention on appeal is straightforward. He contends that the State failed to prove him guilty beyond a reasonable doubt. The relevant question that is raised by Davis' contention is whether, after

viewing the evidence in the light most favorable to the State, any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. If a reviewing court finds in evaluating the evidence that the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt, the conviction must be set aside. *People v. Evans*, 259 Ill. App. 3d 195, 216-17, 631 N.E.2d 281, 295 (1994); *People v. Bell*, 209 Ill. App. 3d 438, 445, 568 N.E.2d 238, 242 (1991); *People v. Young*, 128 Ill. 2d 1, 48, 538 N.E.2d 461, 472 (1989).

■ The State's contention is likewise straightforward. Conceding that there is no direct evidence to prove that Davis is guilty of murder, the State contends that it proved him guilty based on circumstantial evidence. Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered together with all the other evidence in arriving at a verdict. Illinois Pattern Jury Instructions, Criminal, No. 3.02 (3d ed. 1992) (hereinafter IPI Criminal 3d). It is not necessary that the jury be satisfied beyond a reasonable doubt as to each link in the chain of circumstances in order to convict. It is sufficient if all the evidence taken together satisfies the jury of the defendant's guilt beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 380, 586 N.E.2d 1261, 1268 (1992). In addition, in a circumstantial evidence case the State is not required to show that the facts or circumstances proved exclude every reasonable theory of innocence. *People v. Bryant*, 113 Ill. 2d 497, 507-12, 499 N.E.2d 413, 419-20 (1986); IPI Criminal 3d No. 3.02; compare *People v. Linscott*, 114 Ill. 2d 340, 349-57 (1986) (Clark, J., dissenting).

What must not be overlooked, however, is that even in a case in which the State claims that the defendant is guilty based on circumstantial evidence, as in the present case, the State must prove each and every one of the elements of the crime charged beyond a reasonable doubt. See IPI Criminal 3d No. 7.02A. If it were otherwise, a defendant could be proven guilty in a pure circumstantial evidence case on a lesser standard than required in a case involving direct evidence.

The question that surfaces then is whether there is circumstantial evidence to show beyond a reasonable doubt that Davis used the gun when the homicide was committed. This is so because to sustain the charge of first degree murder, one of the essential elements that the State must prove is that the defendant performed the acts which caused the death of the decedent beyond a reasonable doubt. IPI Criminal 3d No. 7.02A.

It is clear that the State has sufficiently proven that the handgun that was used to kill Diane was the handgun which was owned and possessed by Davis in 1987, four years before the homicide. The State has proffered no evidence of any kind, however, to rebut the testimonial fact that the last time that Davis saw the handgun was in 1987. More importantly, there is absolutely no physical or testimonial evidence that can serve as a nexus to show that Davis used the gun when the homicide was committed. The State contends, however, that this essential fact is proven by circumstantial evidence because there is a reasonable inference that Davis had the opportunity to commit the homicide and because he had a motive.

We shall put the State's contention to the kind of crucible that is warranted when, as in this case, a person's liberty is at stake. See *People v. Evans*, 259 Ill. App. 3d 195, 631 N.E.2d 281. A reasonable inference within the purview of the law must have a chain of factual evidentiary antecedents. If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation.

Here, the State contends that there is a reasonable inference that Davis had the opportunity to commit the homicide. According to the State's argument, the factual evidentiary antecedents for such an inference are the following: (1) after Nathaniel went to bed at 11 p.m., Davis got up from his bed that abutted Nathaniel's bed and dressed; (2) Davis took Nathaniel's keys for the Kenilworth home and Nathaniel's car; (3) Davis left the Northbrook townhouse, but not by way of the garage because the noise and vibration from opening the garage door would have awakened Nathaniel; (4) Davis walked to Nathaniel's car, which was parked nearby; (5) Davis got in Nathaniel's car and drove to the Kenilworth home; (6) Davis parked Nathaniel's car near the Kenilworth home; (7) Davis walked to the Kenilworth home and cut the outside telephone wire that led to the screened porch; (8) Davis used Nathaniel's key to surreptitiously enter the Kenilworth home through the main entrance; (9) Davis punched in the alarm code in the alarm system pad and thereby disarmed the alarm system in the Kenilworth home; (10) Davis walked down to the basement of the Kenilworth home and turned off the electricity at the breaker boxes at 1:17 a.m.; (11) Davis walked up the basement stairs and then walked upstairs to Diane's bedroom; (12) during all of this activity Diane did not use the phone that was on the nightstand next to her bed; (13) Davis shot Diane seven times; (14) Davis exited the Kenilworth home and walked to Nathaniel's parked car; (15) Davis left the Kenilworth area and drove Nathaniel's car back to the Northbrook townhouse area; (16) Davis parked

Nathaniel's car in the same spot that it was parked in previously; (17) Davis entered the Northbrook townhouse and went upstairs to the bedroom; (18) Davis put Nathaniel's keys in the same location where Nathaniel had left them; (19) Davis removed his clothing and returned to the bed that abutted Nathaniel's bed; and (20) that Nathaniel awoke at about 9 a.m. without becoming aware that Davis ever left the Northbrook townhouse or that anything unusual had occurred. It is plain, however, that there are no facts to support any of these postulations. Nobody saw or heard Davis do any of the things alleged by the State. Moreover, an intensive police investigation, which included fingerprint testing, blood and hair testing, neighborhood canvassing, numerous interviews, telephone record checks and license plate checks, produced no evidence of any kind that placed Davis in, at or near the Kenilworth home when Diane was killed.

■ It follows that without a single factual evidentiary antecedent to support it, the State's alleged inference that Davis had the opportunity to commit the homicide cannot bear water. It also follows that the State's alleged derivative inference that Davis was the one who used the gun at the time of the homicide is not a reasonable inference within the purview of the law but is, instead, mere speculation. A person's liberty is an endowment that is too valuable to be lost on speculation of wrongdoing. Our system of government demands more: proof! Moreover, the proof must be beyond a reasonable doubt. It does not exist in this case. See *People v. Dowaliby*, 221 Ill. App. 3d 788, 797, 582 N.E.2d 1243, 1249 (1991).

We next address the State's argument about motive. In its brief it states that "added to this circumstantial evidence and the inferences to be drawn from it, is the fact that the defendant had a strong motive to kill Diane Davis." The State goes on to say: "In a circumstantial evidence case a motive is an important piece of evidence to consider. While the State is not required to prove a motive for a deliberate criminal act, the presence of a motive is important in considering the question whether a defendant did commit the act."

The sole reference that the State makes to establish its assertion "that the defendant had a strong motive to kill Diane Davis" is the fact that their divorce case was pending on petition for leave to appeal to the Illinois Supreme Court. If one reads the State's brief and accepts the State's argument, he or she is left with the inexorable conclusion that everyone who is a party to a divorce case has a motive to murder his or her spouse. In this day and age, when divorces are virtually commonplace, the potential for murders being committed by people getting divorces would be immeasurable. Pending divorces, however, are not ordinarily concluded by one spouse murder-

ing the other spouse. The statistical incidents plainly do not support the State's hypothesis.

It is unfair to attribute motive without a factual basis. It follows that before a pending divorce may be said to establish a reasonable inference of motive to commit murder, the facts surrounding the pending divorce must be examined and assessed.

Here, in 1984, Diane filed a petition for dissolution of marriage. Her grounds for dissolution were "irreconcilable differences." In her petition for dissolution of the marriage, Diane did not make any allegation of physical or verbal abuse. In his response to Diane's pleadings, Davis did not contest the grounds for dissolution of the marriage.

At the time of the divorce trial, the parties' total assets were $3.6 million. The major issue at trial was whether the assets contained in a specific brokerage account were marital property or nonmarital property. After trial, the trial court ordered dissolution of the marriage and entered judgment on June 2, 1988. The judgment provided that all of the $3.6 million in assets were marital property to be divided equally between the parties. Also, the judgment classified their residence as Diane's nonmarital property, since title to the residence was in her name. In addition, the judgment provided that Davis did not dissipate marital assets. As a result, Diane was awarded $1.4 million in cash and securities, as well as the marital home, which was valued at $400,000. Davis was awarded $1.4 million in cash and securities.

Davis appealed from the trial court judgment, and Diane cross-appealed. The only issues raised by Davis on appeal involved the classification and distribution of property. In her cross-appeal, Diane claimed that Davis had dissipated marital assets by setting up a marital account which he then exhausted for his own use. Neither party challenged that part of the judgment that dissolved the marriage or the trial court's finding as to grounds for dissolution of the marriage.

On May 14, 1991, the appellate court affirmed in part, reversed in part and remanded. *In re Marriage of Davis*, 215 Ill. App. 3d 763, 576 N.E.2d 44 (1991). The classification and distribution of property were affirmed except that the trial court's finding that the residence was Diane's nonmarital property was reversed. The appellate court held that the Kenilworth home (valued at $400,000 by the trial court) was marital property and that the proceeds from the home were to be divided equally. In addition, the appellate court affirmed the trial court's finding that there was no dissipation of marital assets by Davis. On the issue of Diane's contention that Davis had dissipated marital assets, the appellate court held:

"The record reflects that Nat used funds from the 20505 account for trips with the children and for vacations. As the circuit court found, he was merely maintaining the lifestyle that the parties had enjoyed during the marriage. Maintaining the lifestyle established during the marriage does not support a claim of dissipation. [Citation.] The record shows that Nat was meticulous about documenting his expenditures and that he accounted for every check written. This is not a case where Nat spent funds during the marriage on a girl friend [citation], on other nonfamily purposes [citation], or secreted funds in other places without explanation [citation]." *In re Marriage of Davis*, 215 Ill. App. 3d 763, 777-78, 576 N.E.2d 44, 53-54 (1991).

Thus, the effect of the appellate court's decision was to reduce Diane's award by $200,000, from $1.8 million to $1.6 million. Davis' award was increased by $200,000, from $1.4 million to $1.6 million.

Davis filed a petition for rehearing from the appellate court decision; the petition was denied on July 11, 1991. On July 26, 1991, Davis filed a petition for leave to appeal to the Supreme Court of Illinois, which was denied on October 2, 1991.

In reviewing the facts relating to the divorce, the record shows that there is no allegation or evidence that Davis physically abused or verbally threatened Diane. Nor is there any allegation or evidence that Davis ever exhibited a violent temper toward Diane. Nathaniel never saw his father strike his mother and was unaware of that ever happening. Moreover, Nathaniel never saw his father act violently against anyone, and there was never any physical confrontation in the Davis home. There is also testimony that Davis is a very peaceful person. There is no testimony or evidence that Davis, who is now 68 years old, ever committed any violent act against anyone.

Also, neither Davis nor Diane was appealing from the finding as to grounds for dissolution of the marriage. An appeal from the judgment of dissolution of marriage that does not challenge the finding as to grounds does not delay the finality of that provision of the judgment which dissolves the marriage, beyond the time for appealing from that provision, and either of the parties may remarry pending appeal. Thus, either Davis or Diane was actually free to remarry while the appeal was pending. See 750 ILCS 5/413 (West 1992).

Moreover, the death of Diane did not abate the appeal or change the classification or allocation of the property as had already been determined by the appellate court. See *In re Marriage of Bates*, 163 Ill. App. 3d 893, 900, 517 N.E.2d 23, 27 (1987). The supreme court acted upon and denied the petition for leave to appeal after Diane died. Thus, Davis did not and could not have expected to receive any

monetary gain by having Diane die while the petition for leave to appeal was pending.

In addition, neither Davis nor Diane was or would have been rendered destitute as a result of either the trial court's decision or the appellate court's decision; the appellate court's decision gave Davis a somewhat better result than he would have had if no appeal had been taken. The beneficiaries of Diane's $500,000 whole life insurance policy were Nathaniel and Marie Davis. Moreover, Davis was not a beneficiary of Diane's estate. Thus, Diane's death did not result in Davis receiving any monetary gain whatsoever.

Under the circumstances, while the pending divorce appeal may have been properly admitted into evidence, the facts surrounding the pending divorce manifest that it did not sufficiently establish a reasonable inference of motive to murder. Merely because something is admissible into evidence does not mean that it is sufficient to prove a fact or raise a reasonable inference of a fact. Thus, the State's contention that it proved that Davis had a motive to commit murder is untenable.

It is easy to speculate that Davis killed Diane. But a conviction based on speculation falls below the Plimsoll mark that protects all of our citizens from losing their liberty except by proof beyond a reasonable doubt. Our oath of office demands that we disregard speculation and do what we know must be done in accordance with the cool, dispassionate and courageous application of the law. We must decide cases on proof in the record and not theater of the mind.

In order to convict Davis, the State had to prove beyond a reasonable doubt that he "performed the acts which caused the death" of Diane. IPI Criminal 3d No. 7.02A. The State did not prove beyond a reasonable doubt that he performed the acts which caused the death of Diane. The conviction therefore must be reversed.

Reversed.

TULLY and CERDA, JJ., concur.