2020 IL App (1st) 172058-U

FIRST DISTRICT,
SECOND DIVISION
June 30, 2020

No. 1-17-2058

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 20770 |
| | ) | |
| JOSEPH KESTIAN, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Evidence was sufficient to convict defendant of the first-degree murder of his mother. (2) Defendant's claim regarding alleged Rule 431(b) violation was forfeited and did not constitute plain error because the evidence was not closely balanced. (3) Defendant's 25-year sentence was not excessive.

¶ 2     Defendant Joseph Kestian was convicted after a jury trial of the first-degree murder of his 90-year-old mother, Josephine Kestian.  On appeal, he argues: (1) the evidence was insufficient to convict him of his mother's murder, since the State's case was premised on him being the only other person present in the house when she was fatally strangled, but the State failed to rule out

the possibility of others being present; (2) the trial court violated Supreme Court Rule 431(b) when it asked prospective jurors whether they "disagreed" or had "difficulty with" the principles in the rule, instead of whether they understood and accepted them; and (3) his 25-year sentence was excessive. For the reasons that follow, we affirm.

¶ 3                                                    BACKGROUND

¶ 4        In 2010, the 57-year-old defendant and his 90-year-old mother Josephine lived together in a two-story bungalow in Berwyn, Illinois. They had lived together for over 20 years, with defendant occupying the second floor while Josephine occupied the ground floor.

¶ 5        On October 26, 2010, at 1:41 a.m., defendant made a 911 call to the Berwyn police department. He stated that his mother was lying unconscious on her bedroom floor and he did not know whether she was breathing. He said he could do CPR and would open the door for the paramedics.

¶ 6        Paramedic Philip Chiappetta and his partner were the first responders. Defendant met them at the front door and said, "My mom's not breathing." He led the paramedics inside to Josephine's bedroom, where she was lying on the floor. Chiappetta observed she was not breathing and had no pulse, though a cardiac monitor detected pulseless electrical activity in her heart. Chiappetta began CPR and continued treatment as Josephine was taken away by ambulance, but she flatlined before reaching the hospital.

¶ 7        Various officers also arrived on the scene. Officer Evangelos Ladas entered the house while Josephine was still lying unresponsive on the floor. He noticed a contusion on the right side of her mandible and an abrasion on her neck, and he radioed for police backup. Ladas then inspected the outside of the house. He did not see any signs of forced entry, nor did he see any open windows or doors.

¶ 8        Officer Robert Trofimchuk also inspected the outside of the house and found no signs of forced entry; the windows were closed and locked, as was the back door. He did not look for keys outside the house. Inside, the objects under the windows were orderly and upright, and there were no signs of a struggle. The only items that seemed out of place were in a spare bedroom downstairs (i.e., not Josephine's bedroom): there was a dresser pulled a few inches away from the wall and a figurine on top that was knocked over. There was also $12 in cash sitting atop the dresser.

¶ 9        At around 3 a.m., Sergeant William Ruscitti brought defendant to the hospital, where a doctor and a chaplain spoke with him. The doctor brought defendant to a bed where his mother lay deceased. The doctor asked, "Do you identify this person as Josephine, your mother?" Defendant replied, "Yep, that's her." He placed his fingers on her eyelids, then said, "She's dead. Let's go." Ruscitti asked defendant if he needed a moment, to which defendant repeated, "She's dead. Let's go." At no time did Ruscitti see defendant cry or display any emotion.

¶ 10        Later that morning, defendant was brought to the Berwyn Police Department and photographed by homicide investigator David Green. Green observed small cuts and abrasions on defendant's hands, abrasions on his chest and back, and markings on his arms and face. Defendant claimed that he got the injuries on his hands from cleaning out the gutters around the house a day or two earlier. As for the marks on his back, he thought they looked like he had "recently scratched [his] back" but had no further explanation.

¶ 11        An autopsy of Josephine's body revealed extensive injuries, including abrasions along her jawline and neck, numerous rib fractures that were inconsistent with injuries from CPR, a punctured lung, a broken vertebra, a broken hyoid bone in her neck, and hemorrhages in her eyes. Dr. James Filkins, who performed the autopsy, stated that both the hyoid bone injury and

the eye hemorrhages were indicative of strangulation. He opined that Josephine's death was a homicide and that she died of manual strangulation, *i.e.*, someone strangling her with their hands. Regarding the state in which Josephine was found, Dr. Filkins testified that pulseless electrical activity in the heart can last "about a half an hour at most."

¶ 12   During the autopsy, Dr. Filkins took clippings from Josephine's fingernails. DNA analysis of those clippings revealed a male DNA profile, but there was insufficient DNA for comparison.

¶ 13   At trial, the defense did not dispute that Josephine was murdered, but it argued that there was reasonable doubt as to defendant's guilt because of the possibility that an intruder entered the house and committed the crime.

¶ 14   Defendant was the sole witness on his behalf. He testified that on October 25, he ate dinner with his mother and went upstairs around 7 p.m. Sometime later, he went to sleep. He woke up around 1:30 a.m. and came downstairs to check if his mother was in bed. He saw her on the floor and thought she had fallen, as she had done in the past. Defendant tried to roll her into a sitting position, but she remained unresponsive, at which point he realized something was seriously wrong. He listened for her breathing and heard none. He then called 911.

¶ 15   Paramedics and police officers arrived. The officers directed defendant to sit in the living room and repeatedly asked him why he "d[id] it." Defendant denied involvement, telling the officers that if he murdered his mother he would have done "a better job." But he also told them that he did not believe anyone had broken into the house. Instead, he theorized that his mother fell and then "struggled herself to death" trying to get back into her bed. Eventually, the officers brought defendant to the hospital to view his mother's body. Defendant closed her eyes and said,

"I know she is dead. We can go now," because he knew he was going to be taken to the police station and there was nothing he could do.

¶ 16    While being questioned at the police station, defendant repeatedly referred to his mother as his "meal ticket." He said this to show that he had no motive to commit the murder, since he was unemployed and depended on her for housing and income.

¶ 17    Defendant denied doing anything to harm his mother, though he did not know who might have murdered her. Regarding the possibility of an intruder, defendant testified that spare house keys were kept outside the house, located near the side door that led to the spare bedroom. He also testified that after his mother's death, he noticed her canes were in different rooms: one was by her toilet, while the other was hanging on the dresser in the spare bedroom. This was unusual because she required both canes to walk and would not have left them in different rooms. Defendant noticed two other unusual things in the spare bedroom: the dresser was dislodged from the wall, and a ball-peen hammer, which was normally kept in the basement, was placed on the dresser.

¶ 18    Additionally, defendant testified that he later learned that a necklace of his mother's had gone missing. The necklace had "deep emotional value" to her, because it was her father's wedding band. Anthony Kestian, defendant's brother, likewise testified that he searched the house after Josephine died and could not find the necklace.

¶ 19    The jury found defendant guilty of first-degree murder. Following a sentencing hearing, the trial court sentenced him to 25 years' imprisonment.

¶ 20                                     ANALYSIS

¶ 21    Defendant argues that his conviction must be reversed because (1) the evidence was insufficient to convict him; (2) the trial court failed to properly ascertain whether the venire

understood and accepted the principles in Rule 431(b); and (3) his 25-year sentence was excessive. We consider these contentions in turn.

¶ 22                                        Sufficiency of the Evidence

¶ 23        Defendant first argues that the evidence was insufficient to convict him because the State failed to directly link him to the murder and also failed to rule out the possibility that it was committed by an intruder.

¶ 24        When reviewing the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Thus, we are not required to search out all possible explanations consistent with the defendant's innocence or exclude every possible doubt. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007); *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 74. Rather, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see also *People v. Evans*, 209 Ill. 2d 194, 209 (2004) ("We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt.").

¶ 25        Here, it is undisputed that Josephine died of manual strangulation in the house where she and defendant lived together. Defendant certainly had opportunity to commit the crime, and, more importantly, the trial evidence supports the inference that he was the only other person in the house when the crime occurred. There were no signs of forced entry. The house was not ransacked, and cash was left in plain view atop the dresser in the spare bedroom. Although Josephine was violently assaulted—enough to cause numerous rib fractures, a punctured lung,

and a broken vertebra—defendant did not hear any intruder and initially told police he did not believe anyone had broken into the house. Yet he called 911 shortly after the assault, as evidenced by the fact that paramedics arrived while there was still pulseless electrical activity in Josephine's heart.

¶ 26      Additionally, it is significant that defendant was found with abrasions on his hands, chest and back, and markings on his arms and face. Although defendant claimed that he injured his hands by cleaning out gutters, the jury was not required to find that testimony credible (see *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 75 (evidence was sufficient to convict defendant of murder, notwithstanding defendant testifying to an alternative version of events)), and defendant had no explanation for his remaining injuries. Under these facts, the State's case against defendant, though circumstantial, was not "so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

¶ 27      Defendant nevertheless argues that the State presented no evidence as to whether the front door was locked. Thus, he invites us to speculate that an intruder could have entered through an unlocked front door to murder Josephine. Alternately, an intruder could have found the spare keys hidden on the porch and used them to gain entry to the house. In theory, such an intruder could also have moved various items in the house that were found out of place (the dresser in the spare bedroom, Josephine's canes, the ball-peen hammer from the basement), without disrupting the house further or stealing the cash on the dresser.

¶ 28      But it is well established that "[a] jury is not obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." (Internal quotation marks omitted.) *Evans*, 209 Ill. 2d at 212; see also *People v. Rush*, 294 Ill. App. 3d 334, 337 (1998) ("Proof of guilt beyond a reasonable doubt does not require proof

beyond any possibility of a doubt"). In light of the evidence weighing against the presence of an intruder, as discussed above, the jury could have rationally rejected this possibility.

¶ 29    Defendant also argues that his case is analogous to *People v. Davis*, 278 Ill. App. 3d 532 (1996), and *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991), in which the evidence was insufficient to convict the defendant of murder. We find these cases distinguishable.

¶ 30    In *Davis*, 278 Ill. App. 3d 532, the victim was fatally shot in her bedroom in the early hours of the morning. The murder weapon was owned by the defendant, but he claimed to have lost it four years before the murder occurred, and "[t]he police did not find a single piece of evidence that placed [the defendant] in, at or near the Kenilworth home [where the murder occurred] on the day, evening or night of the homicide." *Id.* at 538. Under these facts, the defendant's mere ownership of the gun was insufficient evidence to convict him of murder. *Id.* at 541. This case is clearly inapposite, since here it is undisputed that defendant was present and had the opportunity to commit the murder, and, as discussed, the evidence supports the inference that he was the only other person present.

¶ 31    In *Dowaliby*, 221 Ill. App. 3d 788, a seven-year-old was reported missing and found dead several days later. Her father, mother, and grandmother all lived in the same house and had opportunity to commit the murder. *Id.* at 798. An intruder could also have committed the murder, since multiple basement windows were unlocked and one was found open. *Id.* at 798-99. Notably, the police only checked one basement window for signs of forced entry. *Id.* Under these facts, and with no physical evidence linking the father to the crime, we held that there was insufficient evidence to convict the father of murder. *Id.* at 799.

¶ 32    *Dowaliby* is distinguishable because it was apparent that multiple people had the opportunity to murder the victim. Here, by contrast, defendant and his mother lived alone, and

multiple officers testified in detail as to their inspection of the house which did not reveal any signs of forced entry. Thus, defendant's theory regarding an intruder is entirely speculative and relies on either the tenuous possibility that the front door was unlocked (for which no evidence was presented at trial) or the equally tenuous possibility that someone found a spare key hidden outside the house and used it to enter. As discussed earlier, the jury was not required to elevate these possibilities to the status of reasonable doubt. *Evans*, 209 Ill. 2d at 212.

¶ 33     *People v. Jackson*, 23 Ill. 2d 360 (1961), is distinguishable for similar reasons. In *Jackson*, defendant fled from narcotics officers and locked herself in her bathroom. The bathroom window opened onto an airwell where the officers later found a package of heroin. But the airwell was accessible from seven other apartments, and trial testimony established that "all of the tenants threw all kinds of rubbish from their bathroom windows." *Id.* at 363. Our supreme court held this evidence insufficient to convict defendant of narcotics possession. Although it acknowledged a "strong suspicion" that defendant threw the heroin from her window (*id.* at 363), the court stated there was no evidence to that effect, since the narcotics were not found in an area over which defendant had exclusive possession. *Id.* at 364. In contrast with *Jackson*, Josephine's murder did not take place in the common area of an apartment building or other, similar setting; it took place in a home she shared exclusively with the defendant and with no signs of forced entry.

¶ 34     In sum, taking all the evidence into account and viewing it in the light most favorable to the State, we cannot say that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, we find the evidence was sufficient to convict defendant of first-degree murder.

¶ 35                                   Compliance with Rule 431(b)

¶ 36    Defendant next argues that the trial court violated Rule 431(b) when it asked prospective jurors whether they "disagreed" or had "difficulty with" the principles in the rule, instead of whether they understood and accepted them.  We review the trial court's compliance with Rule 431(b) *de novo*.  *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 37    Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror *understands* and *accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her."  (Emphasis added.)  Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 38    The record reflects that the trial court questioned the venire as follows:

"Q: [T]hese are four principles of law that our system is based on, and I have to be confident, as do the parties have to be confident, that you understand and are compliant with that law.  The defendant in this case, Mr. Kestian, is presumed to be innocent until the jury determines, after deliberation, that the defendant is guilty beyond a reasonable doubt.  Does anyone disagree with that proposition in any way, shape, or form?

                                        ***

Q: The State has the burden of proving the defendant guilty beyond a reasonable doubt.  Does anyone disagree with that?

                                        ***

Q: The defendant does not have to present any evidence at all and may rely on the presumption of innocence. Does anyone disagree with that?

\*\*\*

Q: Finally, the defendant does not have to testify in his case. Would any of you hold the fact that he did not testify against him in your deliberations?" (Emphasis added.) [R646-47]

¶ 39    The trial court later questioned a second group of jurors similarly, saying: "First of all, the defendant is presumed innocent as he sits there at the table today. Do any of you have any difficulty with the presumption of innocence in this case?"

¶ 40    One prospective juror indicated that he was "not completely understanding." After a brief colloquy with the prospective juror, the trial court explained the presumption of innocence in greater detail, then continued:

"Q: So Mr. Kestian is innocent as he sits there today. Do any of you have any difficulty with that?

\*\*\*

Q: Second of all, Mr. Kestian remains innocent until the State proves him guilty beyond a reasonable doubt. It is the burden of the State to prove him guilty beyond a reasonable doubt. Do any of you have any difficulty with the burden that the State takes in a criminal case to prove their case beyond a reasonable doubt?

\*\*\*

Q: The defense does not have to prove anything. That burden of proof I just talked about is on the State. The defense does not have to prove their innocence. Do any

of you have any difficulty with the fact that the defense is not obligated to prove anything?

\*\*\*

Q: Finally, Mr. Kestian has the right to choose not to testify. Should he choose not to testify, would any of you hold that against Mr. Kestian?"

¶ 41 Defendant argues that, by asking whether the prospective jurors "disagreed" or had "difficulty with" the principles, the trial court may have ascertained whether they *accepted* the principles, but it did not also ascertain whether they *understood* the principles. See *People v. Thompson*, 238 Ill. 2d 598, 607 (2010) (Rule 431(b) "requires questioning on whether the potential jurors both understand and accept each of the enumerated principles"); *People v. Wilmington*, 2013 IL 112938, ¶ 32 ("[T]he trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphasis in original.)).

¶ 42 Defendant acknowledges that he did not object to this questioning and has thereby forfeited any claim of error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He nevertheless argues that we may review the issue under the plain error doctrine, which allows us to consider "clear or obvious" unpreserved error when either (1) the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Here, defendant argues only for first-prong plain-error review, contending that the evidence was closely balanced.

¶ 43 We need not address defendant's claim of error, because we find the evidence was not closely balanced. In determining whether the evidence is closely balanced, we must make a qualitative, common-sense assessment of the evidence in light of all the circumstances of the

case. *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53. As discussed, defendant and Josephine were the only occupants of the house. Although defendant called 911 soon after the assault, he did not observe or encounter an intruder, and the police found no signs of forced entry. Particularly given the brutality of the assault, defendant's account of events—that while he slept, an unknown intruder snuck into the house, beat and strangled Josephine, hung one of her canes on the spare bedroom dresser without taking the cash in plain view, and then left before defendant awoke at 1:30 a.m. and decided to check on his mother—is nothing short of fanciful. Accordingly, we reject defendant's plain error claim. *Id.* ¶¶ 47, 62 (Rule 431(b) errors are not structural errors, and a Rule 431(b) violation does not warrant reversal under first-prong plain error where evidence is not closely balanced); see also *Wilmington*, 2013 IL 112938, ¶ 34 (Rule 431(b) violation did not constitute first-prong plain error because evidence was not closely balanced).

¶ 44                                          Sentencing

¶ 45        Defendant finally argues that his 25-year sentence for the first-degree murder of his mother was excessive in light of his age, his education, and his lack of prior criminal history. We disagree.

¶ 46        The trial court has broad discretionary powers in imposing sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Because the trial court has the opportunity to observe the defendant and weigh such factors as his credibility, demeanor, and mentality, we give great deference to the trial court's judgment and will not alter a defendant's sentence absent an abuse of discretion. *Id.* at 212-13. Here, the trial court sentenced defendant to 25 years' imprisonment, 5 years more than the statutory minimum, but 75 years less than the maximum. In rendering this sentence, the trial court explicitly considered the factors in mitigation—that defendant was

educated, law-abiding, and led "not perhaps a storybook life"—and weighed them against the facts presented at trial. The trial court also explicitly considered defendant's age. Under the circumstances, and particularly given the brutal nature of the crime, we do not find any abuse of discretion. See *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010) ("The existence of mitigating factors does not mandate imposition of the minimum sentence").

¶ 47    Defendant nevertheless argues that his sentence should be reduced because he showed remorse in allocution by telling his family members that he felt their pain. In context, we do not find defendant's statement to be reflective of remorse. Defendant said: "I do feel your pain. Probably worse than all of you. You have to remember, I was accused of murdering Mom." He started expounding upon his theory of the case, to which the trial court sustained objections, and then stated: "[Y]ou have to understand I was accused of murdering Mom and torturing her. That hurts more than anything possible. But I did not do it. I know that sounds impossible to understand right now. I guess we'll be in communication, and I'll be explaining to you precisely what occurred." Defendant was clearly more interested in discussing his own pain than in expressing any kind of compassion. In any event, the trial court was entitled to determine the appropriate weight to give defendant's statements in allocution. In light of the trial court's superior opportunity to observe defendant's demeanor and mentality, we do not find the trial court erred by not sentencing defendant to the minimum sentence.

¶ 48                                CONCLUSION

¶ 49    For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 50    Affirmed.